UNITED STATES of America, Plaintiff,

v.

PETERSEN SAND AND GRAVEL, INC., Defendant.

PETERSEN SAND AND GRAVEL, INC., Defendant/Third Party Plaintiff,

v.

LAKE COUNTY FOREST PRESERVE DISTRICT; Commonwealth Edison Company; the Tewes Company of Libertyville, Inc.; Skokie Valley Asphalt Co., Inc.; Northern Trust Bank/Lake Forest N.A.; American Fly Ash Company; and Lake County Grading Co. of Libertyville, Inc., Third Party Defendants.

No. 91 C 5835.

United States District Court, N.D. Illinois, E.D.

Oct. 8, 1992.

Memorandum Opinion and Order on Motion for Reconsideration Nov. 9, 1992.

Fred L. Foreman, U.S. Atty., Jonathan C. Haile, Asst. U.S. Atty., Chicago, Ill., for plaintiff U.S.

Raymond T. Murphy, Steven Michael Taber, John Van Vranken, Ross & Hardies, P.C., Chicago, Ill., for defendant and third-party plaintiff, Petersen Sand and Gravel, Inc.

Mark E. Burkland, Peter M. Friedman, Burke, Bosselman & Weaver, Chicago, Ill., for third-party defendant Lake County Forest Preserve Dist.

Carolyn Klemme Gerwin, Mark D. Chutkow, Alan P. Bielawski, Sidley & Austin, Chicago, Ill., for third-party defendant Commonwealth Edison Co.

Thomas A. Morris, Jr., Brydges, Riseborough, Morris, Franke & Miller, Chicago, Ill., Paul Eugene Thompson, Thompson & Thompson, Libertyville, Ill., for third-party defendants The Tewes Co. of Libertyville, Inc., Skokie Valley Asphalt Co., Inc., and Lake County Grading Co. of Libertyville, Inc.

James F. Warchall, Maureen M. Crough, Pamela Reasor Hanebutt, Sidley & Austin, Chicago, Ill., for third-party defendant Northern Trust Bank/Lake Forest N.A.

Kevin Jason O'Brien, Butler, Rubin, Newcomer, Saltarelli, Boyd & Krasnow, Chicago, Ill., Frederick Charles Prillaman, Stephen Fredric Hedinger, Mohan, Alewelt, Prillaman & Adami, Springfield, Ill., for third-party defendant American Fly Ash Co.

## AMENDED MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Plaintiff United States of America sues defendant Petersen Sand and Gravel, Inc. ("Petersen, Inc.") for recovery of costs incurred at a hazardous waste site under the

Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"). Petersen, Inc. sues seven third-party defendants under CERCLA for contribution to any judgment the United States obtains against Petersen, Inc. The United States and six of the seven third-party defendants move for summary judgment against Petersen, Inc. under Fed. R.Civ.P. 56.

## BACKGROUND

In this CERCLA action, the United States seeks to recover funds it spent on the remedial investigation of a contaminated site from Petersen, Inc. as the operator of the site. Petersen, Inc. is an Illinois corporation formed in 1970 by Raymond A. Petersen. The United States alleges that beginning in about 1955, Raymond A. Petersen used an area of land ("the site") in Lake County, Illinois to mine sand and gravel. Raymond A. Petersen allegedly began allowing parts of the site to be used for disposing hazardous waste in the 1960's. Petersen, Inc. allegedly continued the practice after its formation in 1970.

In 1982, the Lake County Forest Preserve District ("the Forest Preserve") condemned the site for use as a recreational lake. While working on the site, a Forest Preserve bulldozer struck a buried barrel. The Forest Preserve contacted the United States Environmental Protection Agency ("EPA"); the EPA informed the Forest Preserve that it would be liable for cleanup under CERCLA. The Forest Preserve began cleanup of the site through a private contractor in 1983. The Forest Preserve's contractor completed its site cleanup in December 1983.

The EPA performed a hazardous ranking score evaluation on the site in June 1984. As a result of the evaluation, the site was placed on the National Priorities List, a list of priority releases for long-term remedial evaluation and response. Then the EPA, in conjunction with an Illinois agency, performed the remedial investigation that is the subject of this lawsuit. The remedial investigation revealed that the site contained hazardous substances above levels that occur naturally, but that the site is now basically safe. The United States brought this action in September 1991 to recover the more than $800,000 cost of the remedial investigation.

Petersen, Inc. filed a third-party complaint for contribution from seven third-party defendants under CERCLA, 42 U.S.C. § 9613(f)(1). Apparently,[1] most of the third-party defendants are allegedly liable for the disposal of fly ash—a hazardous byproduct of coal combustion—on the site. Apparently, Petersen, Inc. contends that Commonwealth Edison Company produced the fly ash and that American Fly Ash Company disposed of the fly ash by having it trucked via The Tewes Company of Libertyville, Inc. to Skokie Valley Asphalt Co. Skokie Valley Asphalt Co., which made road base on the Petersen, Inc. site, apparently is alleged to have stockpiled the fly ash in a way that was a disposal under CERCLA. Northern Trust Bank/Lake Forest N.A.'s alleged liability as an owner is apparently based on the bank's acting as trustee of an Illinois land trust that owned the site from 1959 to 1982. Lake County Forest Preserve District's alleged liability as an owner is apparently based on the district's filing a condemnation petition for land on which the site was located in 1974 and receiving title to the land by a final judgment in 1982.

## DISCUSSION

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter

---

**1.** The court writes repeatedly "apparently" because neither Petersen, Inc.'s third-party complaint nor its papers and supporting affidavits make clear the factual basis for Petersen, Inc.'s theory of recovery against any of the third-party defendants. Petersen, Inc.'s third-party complaint merely alleges that each defendant either owned or operated the site or arranged for the disposal of hazardous substances; the complaint consists only of conclusory allegations. Unfortunately, Petersen, Inc. also fails to give a proper factual context in its papers opposing the third-party defendants' motions for summary judgment.

of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the non-movant fails to make a sufficient showing on an essential element of his case, on which he would bear the burden of proof at trial, summary judgment is proper. *Id.* at 322–23, 106 S.Ct. at 2552–53. Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990). Any material fact set forth by the moving papers and not controverted by the opposing papers is deemed admitted. Local Rule 12(n).

## A. *The United States' Motion*

The United States seeks summary judgment on its claim for the cost of the remedial investigation against Petersen, Inc. as operator of the site. In order to recover from Petersen, Inc., CERCLA requires the United States to show that (1) there was a "release" or "threatened release" of a "hazardous substance" from the site; (2) the site is a "facility"; (3) the release caused the United States to incur response costs; and (4) Petersen, Inc. is a responsible party under 42 U.S.C. § 9607(a). Because the United States' failure to show the fourth element—that Petersen, Inc. is a responsible party under Section 9607(a)—obviates any need to explore the other three elements of recovery, the discussion begins there.

To establish that Petersen, Inc. is a responsible party, the United States elects to show that Petersen, Inc. is an "owner or operator" under Section 9607(a)(1). Section 9607(a)(2) confers liability for CERCLA response costs on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The United States maintains that Petersen, Inc. is responsible under Section 9607(a)(2) on three different theories: that barrels of hazardous waste were put into the ground at the site after Petersen, Inc.'s incorporation in 1970; that Petersen, Inc. is liable as a successor in interest to the operator Raymond A. Petersen; and that "disposal" under Section 9607(a)(2) includes passive leaching or leaking that occurred after 1970. The United States has not met its summary judgment burden on any of these theories.

First, the United States cannot prevail on its active disposal theory—that is, the theory that some barrels were delivered and put into the ground while Petersen, Inc. was an operator—because the summary judgment affidavits and depositions only establish that there were barrels on the site after 1970. In support of this theory, the United States relies on two sections of deposition testimony and a declaration. United States 12(m) ¶ 11. But none of these supporting documents establishes that any hazardous waste was either delivered or buried after the incorporation of Petersen, Inc. Rather, the documents only show that there were barrels visible on the site after 1970. *See* Jacobsen Decl. ¶ 3 (In 1971, "I saw 50 or more steel drums in the northwest portion of the pit. Some of the drums were on the side of the pit, and others were half buried in the gravel."); Peters Dep. at 9 ("Q. Did you ever see any barrels being put into the ground out there in Disposal Area No. 2? A. I never did, no."); Graham Dep. at 20 ("Q. So you didn't see the drums actually being dumped at the site? A. No, no. Q. Or being disposed of at the site? A. They were there."). While a jury would be permitted to infer that these barrels were buried after 1970, on a motion for summary judgment a court may not make that inference in favor of a movant. Moreover, Petersen, Inc.'s opposing papers present directly contradictory evidence. *See* Dennis Petersen Dep. at 51 ("Q. When was the last time that you remember seeing barrels delivered to the site? A. I believe it was in '69."). Thus the United States fails to show that there is no genuine issue of material fact as to whether there was active disposal of hazardous waste while Petersen, Inc. operated the site.

The United States' second theory of operator liability posits that Petersen, Inc. is liable as a successor to the business of Raymond A. Petersen. It is undisputed that before incorporation, Raymond A. Petersen disposed of hazardous waste on the site. Petersen, Inc. 12(n) to United States ¶ 12. It is also undisputed that there were no changes in the operation of the sand and gravel mining concern after incorporation. *Id.* ¶ 4 (denied but only on grounds that evidence is based on perceptions of deponents, both of whom are principals in Petersen, Inc.). From these facts, the United States argues that under CERCLA, Petersen, Inc. may be held liable "as a successor" for the pre-incorporation acts of Raymond A. Petersen. United States Memo. at 21.

The United States' first theory founders on the facts; the successor theory founders on the law. As Petersen, Inc. points out, the United States' legal authority for liability on this theory is an amalgam of two common law corporate doctrines: piercing the corporate veil and successor liability. To be sure, there are legal situations where the corporate form is disregarded, *see United States v. Mottolo*, 695 F.Supp. 615, 624 (D.N.H.1988), and there are situations where a corporate successor to the assets of a corporate predecessor also succeeds to the predecessor's liabilities. *See Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325–27 (7th Cir.1990). However, Petersen, Inc. is in neither of those situations. The United States is not seeking to pierce the corporate veil: it does not seek to hold any principal or shareholder of Petersen, Inc. personally liable. Without going into details (because they are not argued by the United States), Petersen, Inc. is likewise not liable as a successor to any statutory liabilities of the individual, Raymond A. Petersen: Petersen, Inc. did not assume any of those liabilities, and there is no contention that Raymond A. Petersen had a fraudulent purpose for incorporating. *See id.* at 1327.

The United States' third theory is that Petersen, Inc. is liable because it was an operator of the site while passive disposal—*i.e.*, leaking and leaching of hazardous substances—occurred. The parties agree that some of the hazardous substances in some of the barrels had seeped into the ground. Petersen, Inc. 12(n) to United States ¶¶ 20–24. The United States argues that the leaking and leaching of barrels is a "disposal" under CERCLA—a "passive" disposal—which may form the basis of operator liability under Section 9607(a)(2). No court in the Seventh Circuit has yet addressed whether passive disposal may form the basis of liability under Section 9607(a)(2). Those courts that have decided the issue are about evenly split. *Compare, e.g., Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 844–46 (4th Cir. 1992) ("passive" is enough for Section 9607(a)); *United States v. Waste Industries, Inc.*, 734 F.2d 159, 164 (4th Cir.1984) (disposal includes "passive" disposal under RCRA); *Stanley Works v. Snydergeneral Corp.*, 781 F.Supp. 659 (E.D.Cal.1990) ("passive" is enough for Section 9607(a)) *with Ecodyne Corp. v. Shah*, 718 F.Supp. 1454, 1455–57 (N.D.Cal.1989) (rejecting "passive" disposal as enough on grammatical construction); *In re Diamond Reo Trucks, Inc.*, 115 B.R. 559, 565–66 (Bankr. W.D.Mich.1990) (adopting *Ecodyne* position).

Although the Seventh Circuit has not addressed this precise issue, it has had occasion to interpret Section 9607(a)(2). In *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155 (7th Cir.1988), the Seventh Circuit determined that a defendant who designed and built a chemical treatment plant owned and operated by the plaintiff was not an "operator" under Section 9607(a)(2). After reciting the language of the statute, the court of appeals explained the function of the courts when interpreting CERCLA:

> We are enforcing a statute rather than modifying rules of common law.... To the point that courts could achieve "more" of the legislative objectives by adding to the lists of those responsible, it is enough to respond that statutes have not only ends but also limits. Born of compromise, laws such as CERCLA and

SARA do not pursue their ends to their logical limits. A court's job is to find and enforce stopping points no less than to implement other legislative choices. *Id.* at 157 (citations omitted). Using the Seventh Circuit's approach to interpreting CERCLA provisions, this court concludes that "passive" disposal does not trigger Section 9607(a)(2) liability.

CERCLA defines "disposal" by reference, incorporating the definition provided by the Resource Conservation and Recovery Act ("RCRA"). *See* 42 U.S.C. § 9601(29). The RCRA in turn defines disposal in the following way:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). In interpreting this provision, some courts have relied on the fact that most of the events constituting "disposal" require an actor. *See Ecodyne,* 718 F.Supp. at 1457. Others point out that such an interpretation arbitrarily denies "leaking" and "spilling" their passive meanings. *See Nurad,* 966 F.2d at 845. Each of these positions is somewhat attractive; neither is dispositive. But there is more to be learned from the definition. The rest of the definition requires that in order for an event to be a "disposal," the event must be one such that waste "may enter the environment or be emitted into the air or discharged into any waters." The kind of migration of substances contemplated by "passive" disposal, however, is itself an entering of the environment; it is not a predicate to entering the environment. Congress appreciated the difference: when it defined "release" in CERCLA, Congress did so as a series of events (spilling, leaking, etc.) followed simply by "into the environment." *See* 42 U.S.C. § 9601(22).

■ In fact, it is the contextual relationship in the statute between "release" and "disposal" that convinces this court that "disposal" does not contemplate passive migration. A "release" or a threatened "release" is a precondition to the authority to act under CERCLA, and it is undisputed that a "release" includes the kind of passive migration at issue here. *See United States v. Petersen Sand & Gravel, Inc.,* No. 91–C5835, at 5–6, 1992 WL 208982 (N.D.Ill. filed Aug. 20, 1992). CERCLA defines "release" as

> [A]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, *or disposing into the environment* (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)....

42 U.S.C.A. § 9601(22) (West Supp.1992) (emphasis added; exceptions omitted). A "release" includes a "disposal," but a "disposal" does not include a "release." In some way, therefore, "release" must be more inclusive than "disposal." [2] Congress could have made operator liability depend on a "release"; instead, Congress designed the entire CERCLA response scheme to activate whenever a "release" occurred, but limited the liability for operators to those who were operators during a "disposal." Some distinction must have been intended, and the so-called innocent owner defense shows that the distinction must have been between active and passive events.

In 1986, Congress amended CERCLA definitions that affect the so-called innocent owner defense under Section 9607(b)(3). Section 9607(b)(3) relieves the liability of a party otherwise responsible under Section 9607(a) in certain circumstances when the damages were caused by

---

**2.** It is not possible to interpret these two definitions without some degree of inconsistency. Whereas "release" includes "disposal," the definition of "disposal" includes component events that are also included in the definition of "release." Because both definitions include "leaking," for example, "release" includes "leaking" twice. What is clear is that "release" was meant to be more inclusive than "disposal."

a third-party who is not an agent or employee of the otherwise responsible party and who is not in a contractual relationship with that party. 42 U.S.C. § 9607(b)(3). The 1986 amendment expanded the scope of this defense to innocent owners by excluding land sales from the definition of "contractual relationship" in certain circumstances. Among other circumstances, the amendment excludes a land sale when

> the real property on which the facility concerned is located was acquired by the defendant after the *disposal or placement* of the hazardous substance on, in, or at the facility and.... At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the *subject of the release or threatened release was disposed of on,* in, or at the facility.

42 U.S.C.A. § 9601(35)(A) (West Supp. 1992).

The amendment sheds light on the issue in three ways. First, in order for the defense to apply in all but the rarest of circumstances, "disposal" must be limited to its active meaning. Otherwise, this defense would be available only to innocent owners who are fortunate enough to have purchased a facility where all the hazardous waste is sealed in concrete—any seeping or leaking on a site occurring after the purchase would eliminate the defense. Put simply, the amendment on its face has a plain purpose: to exclude from liability owners who bought after the hazardous waste was placed on the land and knew nothing about the hazardous waste at the time of purchase.[3] Giving "disposal" passive content would eviscerate that plain purpose. Second, by juxtaposing the two terms, the amendment makes the relative scope of "release" and "disposal" unequivocally clear. The reference to a period "after" a disposal but during ("is the sub-

ject of") a "release" or "threatened" release establishes that "disposal" refers to a discrete human act with a discrete ending. Finally, the amendment likens a "disposal" to a placement, which also requires an affirmative human act.

CERCLA's other contextual references to "disposal" in other sections also bear out the conclusion that "disposal" may not be passive. *See, e.g.,* 42 U.S.C. § 9601(9)(B) (defining facility as, *inter alia,* an area where a hazardous substance has been "disposed of"); *id.* § 9601(23) (including "the disposal of removed material" in the term "removal"); *id.* § 9603(c) (referring to a facility where hazardous waste has been "stored, treated or disposed of"). The inescapable conclusion is that giving "disposal" a passive meaning controverts the plain language of CERCLA.

This conclusion does no violence to the underlying policies of CERCLA. In *Nurad,* the court worried that refusing to give "disposal" a passive meaning would be at odds with CERCLA's strict liability structure and policy of encouraging voluntary private action to remedy environmental hazards. 966 F.2d at 845–46. Those worries are overstated. First, requiring that "disposal" be active before imposing liability has nothing to do with requiring fault. Observing that, as the court did in *Nurad,* 966 F.2d at 846, "the trigger to liability under § 9607(a)(2) is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination," is to do no more than put the rabbit in the hat. Strict liability springs from policy considerations alone; Congress only extended strict liability to ownership or operation at the time of disposal. The question thus becomes, what exactly does Congress mean by "at the time of disposal"? The point is still sharper because at issue is not whether anyone will be strictly liable for damage—after all, CERCLA's

---

**3.** *Nurad* did not consider the "innocent owner" language or argument. *Stanley Works,* on the other hand, rejected it outright. However, the court's discussion was quite limited: "While it is no doubt more likely that the innocent purchaser defense will succeed in circumstances involving passive disposal, this will not always be the

case." *Stanley Works,* 781 F.Supp. at 664. Moreover, it misses the point. If "disposal" is an ongoing, passive process that includes any movement through the environment, it would be the rare owner indeed who acquired the land "after the disposal."

web of strict liability is quite broad—but whether liability for a particular category of persons should be extended beyond the clear design of carefully chosen language. Particularly where the imposition of liability is based on public policy rather than any conception of fairness or culpability, the ultimate question for the court must be not the end but the intended limit. *Cf. Edward Hines*, 861 F.2d at 157.

Rejecting passive events as "disposal" does not discourage private action to clean up environmental hazards. *See Nurad*, 966 F.2d at 845 (under this court's interpretation of "disposal," "an owner could avoid liability simply by standing idle while an environmental hazard festers on his property" and transferring the property before any response costs are incurred). The innocent owner defense is never available to a person who obtained actual knowledge of a release while she owned the property and subsequently transferred the property without disclosing the release. 42 U.S.C. § 9601(35)(C). CERCLA imposes criminal liability (including prison sentences) for failure to report a "release" in a timely manner. *See* 42 U.S.C. § 9603. CERCLA also creates an incentive to investigate the possibility of environmental contamination before a land purchase, making the transfer of contaminated facilities more difficult. *See* 42 U.S.C. § 9601(35)(B). Moreover, state common law that protects land purchasers from the intentional failure to disclose hidden defects would also prevent a malevolent owner from carrying out an environmentally irresponsible scheme. These constraints should operate effectively to close any loophole that Congress may have left open by only imposing liability on those who were owners or operators at the time of an active event constituting disposal of a hazardous substance.

In sum, the United States fails to show there is no genuine issue of material fact as to whether Petersen, Inc. was an owner or operator of a facility at the time of a disposal of hazardous substances. Therefore, the United States' motion for summary judgment is denied.

## B. *The Motions of Commonwealth Edison and American Fly Ash*

Third-party defendants Commonwealth Edison Company ("Commonwealth Edison") and American Fly Ash move for summary judgment against Petersen, Inc. on the ground that neither Commonwealth Edison nor American Fly Ash is a responsible person under Section 9607(a). Petersen, Inc.'s third-party complaint alleges that Commonwealth Edison and American Fly Ash are responsible under Section 9607(a) and liable for contribution under 42 U.S.C. § 9613(g) for any recovery against Petersen, Inc. for arranging the disposal of some fly ash. Commonwealth Edison, an electricity provider, produces fly ash as a by-product of coal combustion. Apparently, Petersen, Inc. contends that some fly ash produced by Commonwealth Edison and delivered by a corporate predecessor of American Fly Ash to what may be the predecessor of another third-party defendant—Skokie Valley Asphalt Company ("Skokie Valley")—was ultimately disposed of on the site.

Petersen, Inc. apparently intends to show that Commonwealth Edison and American Fly Ash are liable for arranging the disposal under CERCLA, 42 U.S.C. § 9607(a)(3). Section 9607(a)(3) makes "any person who by contract, agreement or otherwise arranged for disposal or treatment" of hazardous substances a responsible person. In 1971, American Fly Ash's predecessor, Chicago Fly Ash, executed a contract with Commonwealth Edison regarding Commonwealth Edison's fly ash. *See* Ex. D to Commonwealth Edison 12(m). The contract recognized that there are different grades of fly ash: some fly ash is useful—and commercially valuable—as a raw material to produce road construction materials; some is only fit for disposal. Makowski Aff. ¶ 4, Ex. A to Commonwealth Edison 12(m). Under the contract, Chicago Fly Ash agreed to dispose of all Commonwealth Edison's fly ash, and Commonwealth Edison agreed to pay Chicago Fly Ash for the disposal. Ex. D. to Commonwealth Edison 12(m) §§ 2.01, 5.01. Chicago Fly Ash also agreed to use its best efforts to sell all commercial-grade fly ash. *Id.*

§ 2.05. The contract allowed Commonwealth Edison a partial credit for all commercial-grade fly ash sold against the amount Commonwealth Edison owed to Chicago Fly Ash for disposing fly ash unsuitable for commercial use. *Id.* § 5.01. Petersen, Inc. argues that in selling fly ash to Skokie Valley under the contract, Commonwealth Edison "arranged for" the fly ash's disposal. Commonwealth Edison and American Fly Ash counter that the fly ash at issue was a valuable ingredient in road-base manufacturing and that they sold it to Skokie Valley with the sole expectation that the fly ash would be completely used up by the manufacturing process.

 A party's characterization of its hazardous substance transaction as a sale does not automatically preclude a finding that the party is a responsible person under Section 9607(a). Selling hazardous substances as part of a complete, useful product does not generally make a party a responsible person. *See Prudential Ins. Co. v. U.S. Gypsum*, 711 F.Supp. 1244, 1254 (D.N.J.1989) (selling asbestos contained in fire-proofing and installation not arranging a disposal). Neither does selling a useful ingredient in a manufacturing process. *United States v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373 (8th Cir.1989) (courts have refused to "impose liability where a 'useful' substance is sold to another party who then incorporates it into a product"); *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 656 (N.D.Ill.), *aff'd on other grounds*, 861 F.2d 155 (7th Cir.1988) (selling wood treatment chemicals not arranging a disposal even when the buyer's manufacturing process resulted in run-off). However, a party is a responsible person when a transaction—even though characterized as a "sale"—is a sham for a disposal. *See Sanford Street Local Dev. Corp. v. Textron, Inc.*, 768 F.Supp. 1218, 1222–23 (W.D.Mich. 1991) (sale of manufacturing facilities including hazardous substances at amount vastly below appraised value constituted disposal of the substances). A party can likewise be a responsible person when a party engages a third-party to refine a product and the refining process produces

hazardous runoff. *Aceto*, 872 F.2d at 1381–82 (defendants arranged for disposal by engaging formulator to produce pesticide which resulted in runoff).

As these cases show, there is no bright line between a sale and a disposal under CERCLA. A party's responsibility under Section 9607(a)(3) must by necessity turn on a fact-specific inquiry into the nature of the transaction. *Aceto*, 872 F.2d at 1381 ("courts have not hesitated to look beyond defendants' characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance"). There is some dispute as to whether subjective intent or knowledge is a relevant part of this inquiry. *Compare Prudential*, 711 F.Supp. at 1254 (intent and knowledge irrelevant) *with Edward Hines*, 685 F.Supp. at 656 (court must consider "motivation" behind sale). Objective indications of the purpose of the transaction are, however, certainly relevant—there is no other evidence of whether an act is an arrangement for disposal.

 Even considering the objective indications alone, as a matter of law Commonwealth Edison and Chicago Fly Ash did not arrange for the disposal of the fly ash at issue. There is no doubt that Commonwealth Edison arranged for the disposal of its fly ash with Chicago Fly Ash. The agreement is styled a "Disposal Agreement"; Commonwealth Edison paid Chicago Fly Ash to dispose of all Commonwealth Edison's fly ash. CERCLA's strict liability emphasis aside, however, it goes without saying that Commonwealth Edison must have arranged for the disposal of the fly ash on *this site* to be a responsible person with respect to this site. That Commonwealth Edison did not do. The fly ash was, without dispute, sold to Skokie Valley by Commonwealth Edison and Chicago Fly Ash for valuable consideration for the purpose of manufacturing road base, and for manufacturing road base alone. Makowski Aff. ¶ 5, Ex. A to Commonwealth Edison 12(m); Gumm.Aff. ¶ 9, Ex. B to Commonwealth Edison 12(m); Petersen, Inc. 12(n) to Commonwealth Edison ¶ 7. Certainly, seller liability for the later misuse by the

buyer of useful but hazardous ingredients in a manufacturing process was not intended by CERCLA's authors; such liability would chill permissible manufacturing. Because a sale was the extent of Commonwealth Edison and American Fly Ash's involvement with the site, they are not liable under CERCLA; their motions for summary judgment are granted.

### C. *Skokie Valley's Motion*

Skokie Valley Asphalt Co. ("Skokie Valley") moves for summary judgment against Petersen, Inc. on the ground that Skokie Valley is also not a responsible person under Section 9607(a). There is no disagreement as to whether Skokie Valley, as now incorporated, is itself a responsible person for any of its acts or omissions; it is not. *See* Petersen, Inc. 12(n) to Skokie Valley ¶¶ 52–54. At issue instead is Skokie Valley's liability as a corporate successor to a responsible person; that liability turns on its somewhat complex corporate genealogy.

Until 1978, Skokie Valley was owned and operated by three people: Nicholas and Hercules Gargalas and Ms. Wexler. Frederick Aff., Ex. E to Skokie Valley 12(m) ¶ 3. Skokie Valley manufactured road base on the site. Skokie Valley used fly ash as part of the manufacturing process, and Skokie Valley had fly ash delivered to the site until 1977. Ex. D to Skokie Valley 12(m). In 1978, Liberty Asphalt Co., a company in existence since the mid–1960's, bought all of the assets of Skokie Valley except Skokie Valley's corporate headquarters in Des Plaines, Illinois. The purchase was for cash, not stock, and after the transaction only Liberty Asphalt Co. was a viable concern. Frederick Aff., Ex. E to Skokie Valley 12(m) ¶¶ 5–11.

Liberty Asphalt Co. operated the road base plant on the site for about three weeks. *Id.* ¶ 12. Liberty Asphalt Co. only made "Type A" road base consisting of gravel and water. Liberty Asphalt Co. did not discard or abandon the fly ash at the site; it did not order or accept any fly ash.

*Id.* ¶¶ 12, 24. However, Liberty Asphalt Co. removed some of the fly ash in the course of its operation of the site. Skokie Valley Mot. at 15. In 1984, when the principals of Liberty Asphalt Co. retired, new principals bought Liberty Asphalt Co. and renamed it "Skokie Valley Asphalt Company, Inc."

■ The original Skokie Valley would have been a responsible person under Section 9607(a). The question is whether the newly incarnated Skokie Valley is liable as a successor to either the original Skokie Valley or Liberty Asphalt Co. While the parties devote their efforts to arguing whether Liberty Asphalt Co. is liable as successor to the original Skokie Valley, it is implicitly undisputed that the new Skokie Valley is the same corporation as Liberty Asphalt Co. Petersen, Inc. urges that Skokie Valley is liable for Liberty Asphalt Co.'s short operation of the plant. Petersen, Inc. points out that Skokie Valley admits that "Liberty Asphalt assisted in the clean up of the Site by removing the fly ash through the course of its operation on the Site." Skokie Valley Mot. at 15. While "passive" disposal cannot form the basis for responsibility under Section 9607(a), *see infra*, this admission creates an issue of material fact as to whether Liberty Asphalt Co. had some active involvement with the fly ash on the site—involvement that could constitute a disposal. When there is a disputed issue of material fact, summary judgment is improper. *Celotex, supra.* Skokie Valley's motion for summary judgment is denied.

### D. *Tewes Company of Libertyville, Inc.'s Motion*

■ The Tewes Company of Libertyville, Inc. ("Tewes") moves for summary judgment against Petersen, Inc. on the ground that Tewes is not a responsible person under Section 9607(a) because Tewes did not select the site as the place to haul the fly ash.[4] Tewes was the trucking company that hauled Commonwealth Edison's fly

---

**4.** Tewes also contends that it is not liable as successor to the company that actually did the hauling, Tewes Co. Inc. For purposes of discus-

sion only, the court assumes that Tewes is liable as a successor.

ash to the site. Hale Dep. at 28. Petersen, Inc. urges that Tewes is liable under Section 9607(a)(4), which provides that

> any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites *selected by such person*, from which there is a release ... of a hazardous substance, shall be liable [for response costs].

42 U.S.C. § 9607(a)(4) (emphasis added). Under the unambiguous terms of Section 9607(a)(4) and well-settled case law, a person cannot be liable as a transporter unless that person actually selects the site. *See, e.g., Alcatel Infor. Systems v. Arizona,* 778 F.Supp. 1092, 1096 (D.Ariz.1991); *United States v. Western Processing Co.,* 756 F.Supp. 1416, 1420 (W.D.Wash.1991); *United States v. Hardage,* 761 F.Supp. 1501, 1516–17 (W.D.Okla.1990).

Here, it is undisputed that Tewes did not select the Petersen, Inc. site as the site to deliver the fly ash. Henry Tewes, Jr., a principal in Tewes, offers in his affidavit that "The Tewes Co., Inc. did not select the Petersen Site as the location to deliver the fly ash." Tewes Aff., Ex. H to Tewes 12(m) ¶ 8. Petersen, Inc. denies that Tewes did not make the site selection. *See* Petersen, Inc. 12(n) to Tewes ¶ 43. However, Petersen, Inc.'s citation to deposition testimony is unavailing: the Hale deposition does not assert that Tewes selected the Petersen, Inc. site. Tewes has met its summary judgment burden, and Petersen, Inc. has not offered any evidence beyond the pleadings to establish a genuine issue of material fact. *Cf. Becker, supra.* Tewes' motion for summary judgment is granted.

### E. *The Forest Preserve's Motion*

The Forest Preserve moves for summary judgment against Petersen, Inc. on the ground that the Forest Preserve is an "innocent owner" under CERCLA. To avail itself of this defense, the Forest Preserve must show, among other things, that it had no direct or indirect contractual relationship with any third party who caused a release. 42 U.S.C. § 9607(b)(3). CERCLA

excludes from the definition of "contractual relationship" the acquisition of property by condemnation only if the property "was acquired by the defendant after the disposal or placement of the hazardous substance on, in or at the facility." *Id.* § 9601(35)(A)(ii).

Petersen, Inc. argues that the Forest Preserve is not entitled to the innocent owner defense because the Forest Preserve legally "acquired" the site in 1974, before a disposal occurred. The Forest Preserve initiated proceedings to condemn the Petersen, Inc. site in 1974; a final judgment of condemnation awarded the site to the Forest Preserve in 1982. Exs. P & Y to Forest Preserve 12(m). Petersen, Inc. contends that the Forest Preserve acquired the site upon filing the condemnation petition in 1974, not upon final judgment in 1982. Pointing out that there were deliveries of fly ash to the site as late as 1977, *see* Tewes 12(m) Ex. I, Petersen, Inc. concludes that the Forest Preserve is not an "innocent owner" because disposal of fly ash occurred after the Forest Preserve "acquired" the site. The Forest Preserve counters that Petersen, Inc.'s argument relies principally on a "legal fiction"—the Illinois eminent domain concept that title relates back to the date the condemnation petition was filed—that has no place in CERCLA's liability scheme.

CERCLA does not further define "acquire." When a term is not defined in CERCLA, the Seventh Circuit consults the common law. *See Edward Hines,* 861 F.2d at 157. Given its context in the innocent owner defense, it seems clear that "acquire" here means "to gain ownership of." *Cf.* Black's Law Dictionary 23 (5th ed. 1979). Unfortunately, CERCLA also fails to define "ownership"; under *Edward Hines,* the question turns on whether Illinois law views a municipality as an "owner" once the municipality files a condemnation petition.

In Illinois, although title to condemned property does not vest until the condemnor pays just compensation, that title, as well as all rights and interests in the property, relates back to the date of the filing of the

condemnation petition. *Crystal Lake v. LaSalle Nat. Bank,* 121 Ill.App.3d 346, 76 Ill.Dec. 728, 459 N.E.2d 643, 646 (1984). The Illinois Supreme Court explained the threads and justification for the doctrine as follows:

> The time of filing a petition to condemn is wholly without the control of the owner who, immediately upon the filing of the petition, no longer has the freedom to deal with the property as an owner in fee simple. He has no assurance that the case will proceed to trial and judgment in the year in which the petition is filed or within several years thereafter; he has no assurance that, when an award by a jury is made and judgment entered thereon, the condemning agency will pay the award within a reasonable time. In other words, between the time of filing the petition and the time that the award is actually paid by the condemnor, the owner of real estate cannot enter into long term leases, make improvements, or even maintain the property with hope of reimbursement, and certainly cannot sell it excepting subject to the proceedings then pending.

> The mere filing of a petition to condemn effectively encumbers the land, imposing a burden upon it, impeding its transfer, and to that extent destroying the fee-simple estate of the owner.

*Public Bldg. Com. v. Continental Illinois Nat. Bank & Trust Co.,* 30 Ill.2d 115, 195 N.E.2d 192, 196 (1963). Thus, after a petition to condemn is filed in Illinois: A private owner is not responsible for property taxes immediately from the date a petition is filed, *see id.*; a private owner may only receive the value of the property at the time the petition is filed, *see id.*; and a competing municipality that files a later condemnation petition has inferior rights in the property, *see Crystal Lake,* 76 Ill.Dec. at 735, 459 N.E.2d at 650.

■ On the other hand, a condemnor has no right whatsoever to possess or control the property until the payment of just compensation. *Id.* at 731, 459 N.E.2d at 646. As discussed *infra* on Northern Trust's motion, control is the touchstone of ownership, both generally and for purposes of CERCLA. Even though a private owner may lose some indicia of ownership when a condemnation petition is filed, the condemnor may not exercise those indicia until it pays just compensation. A condemnor cannot prevent environmental damage in the interim, it is not responsible for the damage, and it does not benefit from the damage; there is simply no CERCLA justification for holding the condemnor liable for interim damage. *Cf. Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1455 (9th Cir.1986). Accordingly, a condemnor in Illinois may benefit from CERCLA's innocent owner defense so long as any disposal occurred before the condemnor pays just compensation and actually receives title.

Petersen, Inc. likens the Forest Preserve's liability to the liability of the holder of a security interest that later obtains title to a site through foreclosure. Some federal courts have held a lender liable in those circumstances, but those courts considered a completely different CERCLA provision involving the definition of "owner"—a definition that specifically excludes holders of security interests unless the holder participates in the management of the site. *See* 42 U.S.C. § 9601(20)(A); *Guidice v. BFG Electroplating and Manufacturing Co.,* 732 F.Supp. 556 (W.D.Pa.1989); *United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573 (D.Md.1986). Because that provision is not the issue here, these cases shed little light on the current question of the more general definition of ownership.

Petersen, Inc. also contends that because the Forest Preserve could have withdrawn its petition at any time and the Forest Preserve knew or should have known the site was contaminated, the Forest Preserve cannot benefit from the innocent owner provision. CERCLA's provisions are, however, clearly to the contrary. CERCLA only requires an absence of knowledge if neither of the other two innocent-owner circumstances—either, as is the case here, (1) the defendant is a government entity that acquired through involuntary transfer, or (2) the defendant acquired through inheritance—is present. 42 U.S.C.

§ 9601(35)(A) (requiring "one or more of the" circumstances).

Petersen, Inc. has nonetheless established a genuine issue of material fact that prevents summary judgment in favor of the Forest Preserve. Petersen, Inc. submits an Illinois Environmental Protection Agency form indicating that an agent of the Forest Preserve reported that pesticide drums were disposed of on the site sometime in 1984—well after the Forest Preserve acquired the property through condemnation judgment. Resp. Ex. 6. The Forest Preserve's papers do not address this contention. As there is a genuine dispute over whether a disposal occurred in 1984, the motion for summary judgment must be denied.

### F. *Northern Trust Bank's Motion*

■ Northern Trust Bank/Lake Forest N.A. ("Northern Trust")[5] moves for summary judgment against Petersen, Inc. on the ground that Northern Trust was not an "owner" under Section 9607(a)(2). In 1959, the land on which the Petersen, Inc. site is located was placed into an Illinois land trust, with Northern Trust as the trustee. Ex. A to Northern Trust 12(m). The trust was extended in 1979, *see* Ex. C to Northern Trust 12(m), and terminated in 1982. *See* Moss Aff., Ex. D to Northern Trust 12(m) ¶ 7. Northern Trust therefore held legal title to the land making up the site during all the releases at issue. Petersen, Inc. contends that by virtue of holding legal title to the land, Northern Trust was an "owner" of the land—and therefore a responsible person under Section 9607(a)(2). *See* 42 U.S.C. § 9607(a)(2) (making liable any person who at the time of disposal "owned" any facility). Northern Trust counters that an Illinois land trust is hardly more than a form of title registration; because trustees lack any control over the land whatsoever, there is absolutely no policy justification to hold a trustee liable under CERCLA. At issue is whether holding legal title to real property in Illinois as a

trustee to a land trust is "owning" the property under CERCLA.

CERCLA does not define ownership. *See Edward Hines*, 861 F.2d at 156. When CERCLA leaves a term undefined, courts properly turn to the common law to fill the gap. *Id.* at 157.

An Illinois land trust is an odd legal creature. Although Illinois statutory law now recognizes the validity of a land trust, the land trust was created at common law by the bar. *See* Ill.Rev.Stat. ch. 148, ¶ 71; *People v. Chicago Title & Trust Co.*, 75 Ill.2d 479, 27 Ill.Dec. 476, 389 N.E.2d 540 (1979). The trustee holds both the legal and equitable title; the beneficiary has only a personal property interest. *Id.* However, all but one of the incidents to ownership of real property remain with the beneficiary: The trustee's sole duty under the trust is to hold and dispose of legal title at the written direction of the beneficiaries. *Id.; Robinson v. Chicago National Bank*, 32 Ill.App.2d 55, 176 N.E.2d 659 (1961). It is the beneficiary of an Illinois land trust—and not the trustee—who has full management and control of the property. *Id.* Perhaps as a result of the land trust, Illinois courts make the distinction between title and ownership: Title refers to a legal relationship to the land, while ownership is comparable to control and denotes an interest in the real estate other than that of holding title. *Chicago Title*, 27 Ill.Dec. at 480, 389 N.E.2d at 544. Given this construct, it is the beneficiary who bears the burden of land ownership under Illinois laws, not the trustee. *See, e.g., id.* (beneficiaries were liable for property taxes because they "owned" realty); *IMM Acceptance Corp. v. First Nat. Bank & Trust Co.*, 148 Ill.App.3d 949, 102 Ill.Dec. 232, 499 N.E.2d 1012, 1015 (1986) (for purposes of Statute of Frauds, "true ownership lies with the beneficiary though title lies with the trustee"); *Story v. Latto*, 702 F.Supp. 708, 709 (N.D.Ill.1989) (no Illinois Dram Shop Act liability for holders "of mere naked title").

---

**5.** Northern Trust merged with the bank actually involved in the trust at issue, First National Bank of Lake Forest, in 1986. It is not disputed that Northern Trust stands in the shoes of First National Bank of Lake Forest.

The concepts of ownership codified in federal law and recognized by the Supreme Court would not include Illinois land trustees as owners. For example, in taxing trusts, the United States looks to the amount of control exerted by a trustee to determine ownership. *See* 26 U.S.C. §§ 671–78. The Supreme Court has also outlined an approach for determining ownership for taxation purposes:

> The Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded the simple expedient of drawing up papers as controlling for tax purposes when the objective economic realities are to the contrary. In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding.

*Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978) (citations omitted). Certainly, being a trustee to an Illinois land trust—a legal relationship that carries absolutely no interest whatsoever in the *res* and allows no control over the *res*—is not ownership under these pragmatic federal standards.

Concluding that an Illinois land trustee is an "owner" would not promote the goals of CERCLA. While this conclusion would provide an extraordinarily deep pocket—here, Northern Trust made under $2,000 for being trustee for more than 20 years, but CERCLA could impose over $800,000 in liability—it would not serve CERCLA's primary goal of making those who are responsible for or who benefitted from environmental damage foot the bill. *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1455 (9th Cir.1986). Whereas Congress might have made owners strictly liable because ownership is generally a good proxy for responsibility, paper ownership like that of an Illinois land trustee is wholly unrelated to responsibility. Moreover, as trustees have absolutely no control over the land, "deterring" them with harsh penalties would not result in more CERCLA compliance. Recognizing that trustee liability does not serve the legislative ends of CERCLA, the EPA does not consider trustees liable. *See* 57 Fed.Reg. 18,349 (Apr. 29, 1992) ("innocent trustees or fiduciaries are not liable under CERCLA").

Taking into account the implications of being a trustee to a land trust under Illinois law, the concepts of ownership under federal and Illinois law, and the legislative purposes of CERCLA, the court concludes that being an Illinois land trustee is not "owning" land under Section 9607(a)(2). *Accord United States v. NL Industries*, No. 91–578–JLF, slip op. (S.D.Ill. April 23, 1992) (undertaking careful statutory analysis and reaching same result on identical question). As it is undisputed that being the trustee was Northern Trust's only connection to the Petersen, Inc. site, *see* Petersen, Inc. 12(n) to Northern Trust ¶ 8, Northern Trust is not liable under CERCLA as a matter of law. Northern Trust's motion for summary judgment is granted.

## CONCLUSION

The summary judgment motions of Commonwealth Edison Company, American Fly Ash Company, The Tewes Company of Libertyville, Inc., and Northern Trust Bank/Lake Forest N.A. are granted. The summary judgment motions of the United States, Skokie Valley Asphalt Co., Inc. and Lake County Forest Preserve District are denied.

## MEMORANDUM OPINION AND ORDER ON MOTION FOR RECONSIDERATION

Lake County Forest Preserve District ("the Forest Preserve") moves for reconsideration of this court's order denying summary judgment. Petersen Sand and Gravel, Inc. ("Petersen, Inc.") opposes the motion.

### Motion for Reconsideration

In an amended memorandum opinion and order occasioned by the Forest Preserve's first motion for reconsideration, the court held that there was a genuine issue of material fact as to whether a CERCLA disposal had occurred on the Petersen, Inc. site after the Forest Preserve acquired the

land in 1982. *See* pages 1357–58.[1] In reaching that conclusion, the court relied on Exhibit 6 to Petersen, Inc.'s consolidated memorandum in opposition to summary judgment. Exhibit 6 was an Illinois Environmental Protection Agency ("IEPA") complaint investigation form. The handwriting on the form indicated that an agent of the Forest Preserve reported to the IEPA that four drums containing unknown chemicals were disposed of on Forest Preserve property sometime in 1985. The form describes the location where the drums were dumped in relation to Lake County landmarks; the form does not indicate whether the disposal site was the Petersen, Inc. property.

While the form did not indicate that it referred to the site at issue, Petersen, Inc. did. Petersen, Inc. thrice represented to this court that the form referred to a disposal on the Petersen, Inc. site. *See* Petersen, Inc. Opp. at 33, 34, 36. The court relied on those representations and denied summary judgment.

It is now undisputed that Petersen, Inc.'s representations were entirely false. The IEPA form referred to disposal on Forest Preserve property, but that property is located eleven miles distant from the Petersen, Inc. site. Mot. Ex. A., Laurie Aff. ¶¶ 12, 13.[2] Thus the court's opinion was predicated on an error of fact.

The Forest Preserve moves for reconsideration on the ground that the error was significant and controlling. The Forest Preserve argues that this motion is its first opportunity to address the error. The Forest Preserve points out that it was not authorized to file a reply to Petersen, Inc.'s opposition containing the misrepresentation.[3] The Forest Preserve's first motion for reconsideration could not address the

error because the court's initial opinion did not rely on the misrepresented IEPA form. A court may grant a motion for reconsideration to correct a clear error of fact. *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.1987).

Petersen, Inc. opposes the motion on the grounds that (1) a motion to reconsider can only modify a judgment, not a denial of summary judgment; and (2) the Forest Preserve is not entitled to reconsideration because it did not exercise due diligence in uncovering Petersen, Inc.'s plan to use the IEPA form. These objections are frivolous. As to the first ground, it is absolutely undisputable that a court may, *sua sponte* or on motion, correct clear errors of fact or law in an interlocutory order. *Marconi Wireless Co. v. United States*, 320 U.S. 1, 47–48, 63 S.Ct. 1393, 1414–15, 87 L.Ed. 1731 (1943) (courts have inherent power to modify interlocutory orders); Fed.R.Civ.P. 54(b) (any form of interlocutory decision or order may be modified until final judgment is entered).[4] As to the second ground, Petersen, Inc. has made a significant, material misrepresentation of fact regarding the IEPA form. To be sure, the Forest Preserve might have discovered that Petersen, Inc. had possession of the IEPA form before filing its summary judgment motion. On the other hand, it is ludicrous to suggest that the Forest Preserve should be penalized for failing to divine that Petersen, Inc. intended to misuse or misrepresent the IEPA form before the Forest Preserve moved for summary judgment. *The motion for reconsideration is granted.*

*Merits of Original Summary Judgment Motion*

 Turning to the merits of the original summary judgment motion,[5] the Forest

---

**1.** See this opinion for a detailed factual account of the underlying claims.

**2.** The court accepts as true that the IEPA form does not refer to the Petersen, Inc. site. The Forest Preserve offers the uncontradicted Laurie affidavit. Petersen, Inc. has declined to address the issue on the purported ground that it is not relevant. *See* Recons.Opp. at 2 n. 1.

**3.** This argument is hardly persuasive since the Forest Preserve did not seek leave to file a reply after reviewing Petersen, Inc.'s opposition.

**4.** The court need not address whether the motion is properly brought under Rule 59.

**5.** Petersen, Inc.'s belated attempt to reargue the underlying summary judgment motion in its opposition to the motion for reconsideration is improper and is not considered.

Preserve seeks judgment on the ground that it is an "innocent owner" under CERCLA. Because the Forest Preserve is a government entity that acquired title to the site through eminent domain, it needs to show four requirements to escape liability as an innocent owner: (1) the release was caused solely by an act or omission of a third party who was not an employee or agent of the Forest Preserve; (2) the Forest Preserve exercised due care with respect to the hazardous substance concerned; (3) the Forest Preserve took precautions against foreseeable acts or omissions of any third party; and (4) the disposal or placement of the hazardous substance on, in or at the site occurred before the Forest Preserve acquired the property. 42 U.S.C. §§ 9601(35)(A)(ii), 9607(b)(3).

As to the first requirement, there is not a scintilla of evidence in the record to indicate that the Forest Preserve or any of its agents or employees caused any release. The Forest Preserve demonstrates at length that employees of Raymond A. Petersen were responsible for the barrels on the property. *See* Forest Preserve 12(m) Ex. 5–6. It is undisputed that fly ash operations ceased before the Forest Preserve acquired the land in 1982. This court has rejected the concept of "passive" disposal urged by Petersen, Inc., *see Petersen*, page 1350, and of course, there were no pesticides disposed of on the property after 1982. The Forest Preserve therefore demonstrates by a preponderance of the evidence that the releases were caused solely by third parties.

The Forest Preserve has also shown that it exercised due care with respect to the hazardous substances. As soon as it discovered the disposal, the Forest Preserve notified the IEPA and took remedial action. Forest Preserve 12(m) ¶¶ 54–62. Petersen, Inc.'s only argument to the contrary involves releases before 1982, but the court has already rejected the notion that the Forest Preserve acquired the property before 1982. *See Petersen*, page 1357. Obviously, the Forest Preserve need not exercise due care as the owner of property before it *is* the owner of that property. For the same reason, the Forest Preserve has met the fourth requirement—the Forest Preserve has shown that it took reasonable precautions against acts or omissions by third parties. *See* H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. at 86–87 (duty only arises after ownership).

Finally, the Forest Preserve has shown that the disposal or placement occurred before it acquired the property. The Forest Preserve acquired the site in 1982. *See Petersen*, pages 1356–58. There is nothing in the record even suggesting a disposal after 1982.

Because the Forest Preserve has met the requirements of CERCLA's innocent owner defense, it is entitled to summary judgment.

*Sanctions*

Resolution of the underlying summary judgment motion does not, however, end the matter. Petersen, Inc. made affirmative misrepresentations to this court in a pleading. Petersen, Inc.'s opposition to summary judgment misrepresented that the IEPA form referred to a disposal on the Petersen, Inc. site. The form referred to no such disposal.

The court finds that Petersen, Inc.'s opposition papers violated Rule 11. Rule 11 calls for the signer of a pleading to certify that she believes, after making reasonable inquiry, that the pleading is well grounded in fact. Fed.R.Civ.P. 11. The court may, on its own initiative, impose on a signer who violates Rule 11 an appropriate sanction, including attorney's fees. Petersen, Inc.'s opposition was not well grounded in fact—Exhibit 6 did not refer to the place Petersen, Inc. claimed it did three times in its opposition memorandum. Moreover, even the most fundamental inquiry would have involved an investigation of whether the IEPA form referred to the site at issue. Although the form itself did not speak in terms that only developed during this litigation—i.e., the form did not refer to the "Petersen, Inc. site"—the form on its face referred to a different area. Merely looking at a map would have revealed the discrepancy. *See* Laurie Aff. ¶ 11–12. There was simply no reasonable basis for conclud-

**1362**

ing that the form referred to the Petersen, Inc. site. Therefore Petersen, Inc. could not have formed a good faith belief that its pleading was well grounded in fact after making reasonable inquiry. To make matters worse, when confronted with its misrepresentation by this motion, Petersen, Inc. refused to acknowledge it. Instead of clarifying, it continued to obfuscate. *See* Recons.Opp. at 2 n. 1.

As a direct result of Petersen, Inc.'s violation, the Forest Preserve was required to brief this motion for reconsideration. The court therefore orders counsel for Petersen, Inc. to pay the Forest Preserve its reasonable attorney's fees in preparing its motion and memoranda for reconsideration.

CONCLUSION

The motion for reconsideration is granted. Lake County Forest Preserve District's motion for summary judgment is granted. Judgment is entered in favor of third-party defendant Lake County Forest Preserve District and against third-party plaintiff Petersen Sand and Gravel, Inc. Counsel for Petersen Sand and Gravel, Inc. is ordered to pay the Forest Preserve its reasonable attorney's fees in preparing this motion.