IDYLWOODS ASSOCIATES, and
Kam, Inc., Plaintiffs,

v.

MADER CAPITAL, INC., Slate Bottom
Creek Apartments, Inc., Marc Equity
Partners I, Trustees of the Mader Con-
struction Corporation Employees Profit
Sharing Plan (formerly the Mader Cor-
poration Employees Profit Sharing
Plan), Witben Realty Corporation, Ser-
eth Properties, Inc., Wolsher, Inc., Uni-
versal Marion Corporation, American
Premier Underwriters, Inc., and Louis
E. Wolfson, Defendants.

No. 91–CV–364S.

United States District Court,
W.D. New York.

Feb. 16, 1996.

**1292**

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, New York, for Plaintiffs; Robert E. Glanville, of counsel.

Duke, Holzman, Yaeger & Radlin, Buffalo, New York, for Mader Capital, Slate Bottom Creek Apartments, Marc Equity Partners, Trustees of Mader Profit Sharing Plan; Peter G. Ruppar, of counsel.

Periconi & Rothberg, P.C., New York, New York, for American Premier Underwriters; James J. Periconi, of counsel.

Harter, Secrest, and Emery, Buffalo, New York, for Witben Realty, Sereth Properties, Wolsher, Inc., Universal Marion Corp., and Louis E. Wolfson; Craig A. Slater, of counsel.

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

The parties to this matter executed a consent to proceed before the undersigned on the pending summary judgment motions on March 6, 1995. The matter is presently before the court on Defendant American Premier Underwriters, Inc.'s motion for partial summary judgment, filed April 17, 1995; Defendant Louis E. Wolfson's motion for summary judgment, dated April 17, 1995; and Defendants Witben Realty, Sereth Properties, Wolsher, Inc., and Universal Marion Corporation's motion for summary judgment, dated April 17, 1995.

### BACKGROUND

Plaintiffs, Idylwoods Associates and Kam, Inc., filed the complaint in this action against Defendants Mader Capital ("Mader"), Slate Bottom Creek Apartments, Inc. ("SBC"), Marc Equity Partners I ("Marc Equity"), and the Trustees of the Mader Construction Corporation Employees Profit Sharing Plan (the "Trustees") on June 5, 1991, alleging four causes of action, including a claim under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), claiming that Mader, SBC, Marc Equity, and the Trustees were strictly liable to Plaintiffs for costs and damages relating to the discovery of hazardous waste on property sold by these Defendants to Plaintiffs, along with state claims for false representation, breach of warranty, and fraudulent inducement to en-

ter into a contract. Plaintiffs are seeking a declaratory judgment that these Defendants are liable to Plaintiffs for all past, present, and future response costs incurred in connection with the release, threat of release, or disposal of hazardous substances on the property; damages for costs associated with remediating the environmental conditions on the property, or, alternatively for damages in the amount by which the fair market value of the property has been diminished by the presence of toxic wastes; a declaration that toxic wastes were present on the property prior to the time the property was transferred to Plaintiffs; and, indemnification against any liability or claim which may be asserted with respect to the toxic wastes on the property. These Defendants answered the complaint on September 5, 1991.

On September 12, 1991, Defendants Mader, SBC, Marc Equity, and the Trustees filed a third-party complaint against Defendants Witben Realty Corporation ("Witben"), Sereth Properties ("Sereth"), Wolsher, Inc., and Universal Marion Corporation ("Universal Marion") alleging that the third-party Defendants were all present owners of portions of the property containing hazardous waste, and alleging causes of action against these Defendants under CERCLA, and state causes of action for creating and maintaining a continuing nuisance, trespass, strict liability, negligence, equitable subrogation, and restitution.

On August 3, 1992, the undersigned issued an order staying the proceedings in this action pending ongoing negotiations by certain parties with the New York State Department of Environmental Conservation ("NYS-DEC"), except that Plaintiffs or any other party would be permitted to amend the complaint as needed. The parties were directed to report back to the undersigned every three months on the status of the negotiations.

On March 8, 1993, the court authorized the filing of an amended complaint, and, on the same day, an amended complaint was filed by Plaintiffs adding Witben, Sereth, Wolsher, Universal Marion, Penn Central Corporation ("Penn Central") and Louis E. Wolfson ("Wolfson") as named Defendants, and add-

ing five causes of action for nuisance, trespass, strict liability for possession of hazardous wastes, negligence, and violation of New York Navigation Law § 173. Thereafter, on May 18, 1994, an order was entered substituting American Premier Underwriters, Inc. ("APU"), as a successor corporation, for Defendant Penn Central.

On May 18, 1994, the court vacated the stay of all proceedings imposed on August 4, 1992 with respect to APU, Wolfson, Universal Marion, Wolsher, Witben, and Sereth. The stay, however, remained in effect for Plaintiffs and Mader, SBC, Marc Equity, and the Trustees.

On June 20, 1994, Defendant APU filed a cross-claim against Defendants Witben, Sereth, Wolsher, Universal Marion, and Wolfson alleging three causes of action, two claims under CERCLA and one state claim for contribution based on APU's agreement to undertake the remedial work required by the NYSDEC on the property. On June 22, 1995, Sereth filed two counterclaims against Plaintiffs and two crossclaims against the adverse parties under CERCLA, and for common law contribution and indemnification, and seven cross-claims against Penn Central (now APU) for a violation of Article 12 of the New York Navigation Law, contractual indemnification, negligence, negligence per se, trespass, private nuisance, and public nuisance. On the same day, Defendants Universal Marion, Wolsher, Witben, and Wolfson filed the same counterclaims and cross-claims as Sereth against Plaintiffs, the adverse parties, and APU.

On April 17, 1995, Defendant APU filed a motion for partial summary judgment on its first and second cross-claims against Wolfson, Universal Marion, and Witben. On the same day, Defendant Wolfson filed a motion for summary judgment on the ground that Wolfson was not liable to APU for any damages or costs under CERCLA or any other theory of liability. Similarly, Defendants Witben, Sereth, Wolsher, and Universal Marion filed a motion for summary judgment on the ground that those Defendants were not liable to APU for any damages or costs under CERCLA or any other theory of liability. Supporting and opposition memoranda

and affidavits were filed between April 17, 1995 and June 5, 1995.

Oral argument on the motions was held on June 21, 1995.

For the reasons as set forth below, Defendant APU's motion for partial summary judgment is GRANTED in part and DENIED in part; Defendant Wolfson's motion for summary judgment is GRANTED in part and DENIED in part; and, Defendants Witben, Sereth, Wolsher, and Universal Marion's motion for summary judgment is GRANTED in part and DENIED in part.

### FACTS

Between 1920 and 1959, the New York Central Railroad Company ("NYCRC") and a subsidiary, the New York State Realty & Terminal Company (the "Terminal"), jointly owned approximately 1131 acres of property located in the Towns of Cheektowaga and West Seneca, New York near the intersections of Union and French Roads and Losson Road.[1] During that time, NYCRC operated a railroad classification and maintenance yard on the site known as the Gardenville Yard. According to Edmund C. Wesolowski, a laborer for NYCRC from May 14, 1920 until November 30, 1970 who worked at the Gardenville Yard from 1940 until 1955, Deposition of Wesolowski, Exhibit 9, Affidavit of Louis E. Wolfson, at pp. 4, 8, 27 ("Wesolowski Deposition"), railroad cars carrying drums of waste, such as oil, spoiled food, sludge, and scrap, Wesolowski Deposition, at pp. 14–17, were brought to the roundhouse situated at the Gardenville Yard, and dumped into a pit approximately once a month. Wesolowski Deposition, at pp. 26, 28–29. Other items such as stone and bricks were dumped in between the monthly dumpings of waste. Wesolowski Deposition, at p. 34. The drums were then reused, not left at the site. Wesolowski Deposition, at p. 26. The dumping occurred only in that one area near the roundhouse, and on no other portion near the property. Wesolowski Deposition, at p. 31. NYCRC ceased its operations at the Gardenville Yard in or about 1955.

Memorandum of Law of Defendant APU, dated April 17, 1995, at p. 8.

Universal Marion is a publicly held Florida corporation with a principal place of business in Jacksonville. Wolfson, an investor, owns approximately 11% of the stock, and, when combined with other family members, the Wolfson block holds approximately 39% of the stock of Universal Marion. In the 1950's Universal Marion was primarily in the industrial supply business. Wolfson Deposition, Exhibits in Support of Defendants Witben, et al's Motion for Summary Judgment, at p. 10. During that time, Universal Marion became involved in real estate investing and development, although, according to Wolfson, Universal Marion did not remain in that business as the head of its real estate division passed away. Wolfson Deposition, at p. 11.

During 1959, however, Wolfson learned that NYCRC was interested in conveying the Gardenville property. Leon Kaye, head of Universal Marion's real estate division, went to Buffalo at Wolfson's direction, and met with James Oppenheimer, a Buffalo real estate broker, to assess the property and its potential for industrial development. Notice of Motion by APU, Statement of Material Facts, at p. 8, ¶¶ 45–47. Thereafter, in 1959, NYCRC entered into a lease agreement and executory contract with Wolfson with respect to the entire parcel of 1131 acres. Notice of Motion by APU, Statement of Material Facts, at p. 2, ¶ 6. In that agreement, Wolfson leased a parcel of 535 acres from the NYCRC, and, in addition, was granted an option to purchase or lease an additional approximately 600 acres (later found to be 595 acres) of the NYCRC property. Notice of Motion by APU, Statement of Material Facts, at p. 2–3, ¶ 6. Subsequently, on December 14 and 18, 1959, Wolfson purchased the 535 acres by two deeds, one for 266 acres, the other for 269 acres.

On December 14, 1959, Wolfson conveyed the 266 acres to Defendant Sereth, a corporation; on December 21, 1959, Wolfson conveyed the other 269 acres to four couples who were friends of Wolfson and his brother. Notice of Motion by APU, Statement of Ma-

---

1. The fact statement is taken from the papers filed in relation to the instant motions for summary judgment, along with the Complaint and Amended Complaint filed in this action.

terial Facts, at pp. 3–4, ¶¶ 9, 14–15. Wolfson, however, retained the rights to fill, gravel, and cinders on both parcels until December, 1962. Notice of Motion by APU, Statement of Material Facts, at p. 5, ¶ 23.

On June 17, 1960, Witben Realty Corporation was formed by the four couples. The 269 acres was then deeded to Witben shortly thereafter. The majority of the inactive hazardous waste disposal site known as the Union Road Site at issue in this case is located on these 269 acres, which includes the former railroad roundhouse area. Notice of Motion by APU, Statement of Material Facts, at p. 4, ¶¶ 17–18.

Also in 1960, Universal Marion acquired 100% of the stock of Witben and Sereth. Notice of Motion by APU, Statement of Material Facts, at p. 5, ¶ 20. The officers and directors of Universal Marion were also the officers and directors of both Witben and Sereth. Notice of Motion by APU, Statement of Material Facts, at p. 8, ¶ 40.

The rights to fill, gravel, and cinders on both parcels were deeded to Sereth and Witben in December, 1962. Notice of Motion by APU, Statement of Material Facts, at p. 5, ¶ 23.

On August 21, 1961, Wolfson exercised his option on the remaining approximately 595 acres from NYCRC when he executed an "Assignment of Lease and Executory Contract" by which he assigned an undivided one-fourth interest in the lease agreement to his friend, Isidore Sherman. On the same day, Wolfson and Sherman assigned the agreement to Wolsher, Inc., a Florida corporation. Notice of Motion by APU, Statement of Material Facts, at p. 5, ¶ 24–25. Wolsher leased the approximately 595 acres from NYCRC by Indenture of Lease, dated April 12, 1965. Notice of Motion by APU, Statement of Material Facts, at p. 6, ¶ 27. In 1968, Penn Central became the successor corporation to NYCRC. At that time, Penn Central conveyed the approximately 595 acres comprising the balance of the former Gardenville Yard to Wolsher in six separate deeds. Notice of Motion by APU, Statement of Material Facts, at p. 6, ¶ 28.

In 1966, Sereth deeded its portion of the property, the 266 acres, to Witben.

Wolsher, whose two shareholders were Wolfson and Universal Marion, was liquidated in 1971. Notice of Motion by APU, Statement of Material Facts, at pp. 6–7, ¶ 32. Title to Wolsher's property holdings in the former Gardenville Yard was conveyed to Wolfson and Universal Marion by deed executed May 14, 1971 with an undivided three-fourths interest going to Universal Marion and an undivided one-fourth interest going to Wolfson. Notice of Motion by APU, Statement of Material Facts, at p. 7, ¶ 33. Wolsher's holdings included a 7.5 acre parcel that is now included in the boundary of the Union Road Site. Notice of Motion by APU, Statement of Material Facts, at p. 7, ¶ 34. According to APU, at this time, Universal and Witben jointly hold title to that 7.5 acre parcel. Notice of Motion by APU, Statement of Material Facts, at p. 7, ¶ 37.

During the 1970's and 1980's, Universal Marion and Witben, and Universal Marion and Sereth jointly conveyed portions of the real property, not including any property located on the Union Road Site, to third-parties. Defendants Mader, SBC, Marc Equity, and the Trustees were third-party purchasers of parcels of real property from Witben and/or Universal Marion. The proceeds from all of the sales of real property were deposited in Universal Marion's accounts as Witben and Sereth did not maintain separate accounts from Universal Marion. Notice of Motion by APU, Statement of Material Facts, at pp. 8–9, ¶¶ 42, 50–51. Harry Prince, an employee of Universal Marion who was responsible for Universal Marion's real estate operations handled maintenance, sales, and marketing of the property. Notice of Motion by APU, Statement of Material Facts, at pp. 6, 9, ¶¶ 29, 49. During this time period, Universal Marion and Witben shared a common office, shared corporate officers, had joint books and records, and filed consolidated tax returns. Notice of Motion by APU, Statement of Material Facts, at pp. 8–10, ¶¶ 43, 52–53, 55–56. Also, Universal Marion paid all of the property taxes for the property owned by Witben, including the parcels which subsequently fell within the

boundaries of the Union Road Site, from 1973 until 1983. Notice of Motion by APU, Statement of Material Facts, at p. 9, ¶ 54.

Prior to October, 1984, Universal Marion sold all of the property owned by Witben, with the exception of a parcel of property known as the Losson Road property. Notice of Motion by APU, Statement of Material Facts, at p. 12, ¶ 71. The Union Road Site falls largely within the boundary of the Losson Road property. Notice of Motion by APU, Statement of Material Facts, at p. 2, ¶ 1.

In late 1982, inspectors from the Erie County Department of Environment and Planning ("DEP") inspected an area of property, now known as the Union Road Site, located adjacent to Losson Road in response to a complaint. Notice of Motion by APU, Statement of Material Facts, at p. 12, ¶ 72–73. The inspectors found a depression measuring approximately 80 feet by 140 feet containing a tar-like material and approximately 50 drums filled with unidentified substances. Notice of Motion by APU, Statement of Material Facts, at p. 13, ¶ 74. The area was also found to be littered with "a great deal of construction and demolition type debris," along with household trash. Notice of Motion by APU, Statement of Material Facts, at p. 13, ¶ 75. Surface water was observed to be passing from the depression or pit, through a marshy area, and draining into an adjacent creek known as Slate Bottom Creek. Notice of Motion by APU, Statement of Material Facts, at p. 13, ¶ 75. Many drums were found abandoned in the tar pit, although the source of these drums was not known as the practice of the railroad was to reuse the drums and not to dispose of the drums in the pit. Notice of Motion by APU, Statement of Material Facts, at p. 16, ¶ 93. The tar-like material was subsequently sampled, along with the water, and some concentrations of metal, asphalt, and lubrication oil were found, along with polychlorinated biphenyls ("PCBs") and small amounts of phenol and phenolic compounds. Notice of Motion by APU, Statement of Material Facts, at p. 13, ¶ 77–78.

The DEP notified Universal Marion, by letter dated December 30, 1982, that an abandoned disposal site had been discovered on the property, and requested cooperation in cleaning up the site. Notice of Motion by APU, Statement of Material Facts, at p. 13–14, ¶¶ 79–80. Counsel for Universal Marion, Charles P. Maxwell, replied to the letter, stating that the situation "may have been caused by the contractors in connection with the Losson Road relocation," a prior construction project. Notice of Motion by APU, Statement of Material Facts, at p. 14, ¶ 81. A January 14, 1983 letter from DEP to Universal Marion indicated that site ownership needed to be determined. Notice of Motion by APU, Statement of Material Facts, at p. 14, ¶ 83.

On July 20, 1983, Universal Marion retained a consulting firm, Recra Research, Inc. to perform testing at the waste disposal site, and paid for the sampling and analysis which was performed. Notice of Motion by APU, Statement of Material Facts, at p. 14, ¶ 84–85. The field tests were performed in August, 1983, and, on March 13, 1984, Recra submitted its report to Maxwell stating, among other things, that waste material had been discovered which should be removed and disposed of, and that there was a source of contamination. Notice of Motion by APU, Statement of Material Facts, at p. 15, ¶ 91. On May 9, 1984, Maxwell submitted the report to the New York State Department of Environmental Conservation ("DEC"). Notice of Motion by APU, Statement of Material Facts, at p. 16, ¶ 95.

The DEC, by letter dated June 29, 1984, recommended that Universal Marion undertake certain clean-up activities, including the removal of tars, the removal of drums, and additional sampling; the cost at that time thought to be approximately $500,000. Notice of Motion by APU, Statement of Material Facts, at pp. 16–17, ¶ 96, 100–101. Not receiving an answer, the DEC again wrote to Universal Marion on October 11, 1984. In the letter, the DEC noted that, in meetings between the DEC and Maxwell, that Maxwell had indicated that the property where the hazardous waste had been found was owned by Witben, not Universal Marion. Notice of Motion by APU, Statement of Material Facts, at p. 17, ¶ 98. The DEC requested

financial statements from Witben and Universal Marion, as well as a title search showing present and previous owners. Universal Marion replied, through Maxwell, on October 26, 1984, stating that Witben had owned the parcel since 1960, and that the parcel was Witben's sole asset. Maxwell declined to send financial statements from Universal Marion, stating that the shareholders' position was that the land was owned by Witben. Notice of Motion by APU, Statement of Material Facts, at pp. 17–18, ¶¶ 103–105.

At a November 2, 1984 Universal Marion board meeting, Universal Marion voted to dissolve Universal Marion [2]; the shareholders voted unanimously to dissolve a few weeks later. Universal Marion then began to default on property tax bills, previously paid by Universal Marion on Witben's behalf, on the parcel in question. Notice of Motion by APU, Statement of Material Facts, at p. 19, ¶¶ 111–114. Liquidating distributions were made to the Universal Marion shareholders. Notice of Motion by APU, Statement of Material Facts, at p. 19, ¶ 115.

In 1984, the Town of Cheektowaga and the DEC notified counsel for Wolfson, Universal Marion, and Witben of their responsibility to secure the property from unauthorized dumping. Notice of Motion by APU, Statement of Material Facts, at p. 21, ¶ 124. No steps were taken, and the Town of Cheektowaga caused the property to be fenced, at the Town's expense, in February, 1986. Notice of Motion by APU, Statement of Material Facts, at p. 20, ¶ 120.

Meanwhile, on June 11, 1985, Mader, SBC, Marc Equity, and the Trustees entered into an agreement with Home Leasing Corporation by which they agreed to sell to Home Leasing certain apartment units and vacant land located in the Town of Cheektowaga near the hazardous waste site, known as the "Idylwoods Property." Complaint, dated June 5, 1991, at p. 3, ¶ 10. On August 8, 1985, Home Leasing assigned its rights to purchase the Idylwoods Property to Plaintiffs KAM and Idylwoods Associates. Complaint, dated June 5, 1991, at p. 3, ¶ 11. By deed dated August 29, 1985, Mader, SBC, Marc Equity, and the Trustees conveyed the Idylwoods Property to Plaintiffs. Complaint, dated June 5, 1991, at p. 4, ¶ 12.

Investigators inspecting the Union Road Site in 1986 found 81 drums, which were almost completely empty, except for some drums containing a solid material described as "stone with binder." Notice of Motion by APU, Statement of Material Facts, at p. 21, ¶ 129. The DEC notified Penn Central, in 1986, that the Union Road Site might constitute a threat to the environment, and that Penn Central was considered a potentially responsible party ("PRP") [3]; similar letters were sent to Witben and Universal Marion. Notice of Motion by APU, Statement of Material Facts, at pp. 21–22, ¶ 130–131. After the DEC found that the tar-like material had migrated from the pit to the banks of Slate Bottom Creek, the United States Environmental Protection Agency ("EPA"), in February, 1987, collected samples from the creek, and, in 1988, erected a high visibility fence and hazardous waste warning signs, which the DEC later replaced. Notice of Motion by APU, Statement of Material Facts, at p. 22, ¶¶ 133–135.

A Proposed Remedial Action Plan was developed for the Union Road Site by the DEC, and, in February, 1992, APU, the successor to Penn Central, submitted comments on the plan and informed the DEC that it would participate in the remediation. Notice of Motion by APU, Statement of Material Facts, at p. 23, ¶ 140. The DEC requested the participation not only of APU, but of Witben, Universal Marion, and Wolfson in the implementation of the plan. While initially cooperating with negotiations, counsel for Witben, Universal Marion, and Wolfson subsequently withdrew from the negotiations. Notice of Motion by APU, Statement of Material Facts, at p. 23, ¶ 141–42. In June, 1993, the DEC approved APU's proposed work plan, and, on March 28, 1994,

---

**2.** Universal Marion had voted to voluntarily liquidate in 1971. Deposition of Richard M. Gray, dated November 7, 1994, at p. 5.

**3.** A potential responsible party, or a PRP, is a legal term established under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and will be discussed further in this Decision and Order.

without admitting liability for the Union Road Site, APU entered into a consent order with the DEC, and agreed to perform the remedial action selected by the DEC at a cost of approximately $11 million. Notice of Motion by APU, Statement of Material Facts, at pp. 23–24, ¶¶ 143–44.

## *DISCUSSION*

Summary judgment will be granted pursuant to Fed.R.Civ.P. 56 when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of a genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985).

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. at 2514; *Rattner, supra,* at 209.

In this case, Defendant APU seeks summary judgment on its first and second cross-claims alleging causes of action under CERCLA against Defendants Witben, Universal Marion, and Wolfson. Defendant Wolfson seeks summary judgment against APU on the ground that he is not liable to APU for any damages under CERCLA or any other theory of liability; Defendants Witben, Sereth, Wolsher, and Universal Marion seek similar relief in their summary judgment motion against APU.

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., provides for the clean up of hazardous substances that threaten the environment and human health. *B.F. Goodrich Company v. Murtha,* 958 F.2d 1192, 1197 (2d Cir.1992). The statute imposes strict liability for the costs associated with responding to the release or threatened release of the hazardous substance. *B.F. Goodrich Co., supra,* at 1198; *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985). Liability for response costs may be imposed on various classes of responsible persons, including past and present owners or operators of facilities, transporters of hazardous substances, and those who generate or arrange for the disposal or treatment of hazardous substances. 42 U.S.C. § 9607(a). The statute also allows any individual or entity who has incurred response costs in connection with the clean up of hazardous waste sites to sue a responsible defendant for these costs. 42 U.S.C. § 9607(a)(4)(B). In addition, as CERCLA liability is joint and several, any one party found to be liable for response costs is potentially liable for the entire cost of responding to a hazardous waste site. *B.F. Goodrich Co., supra,* at 1198.

To establish a prima facie case for liability under CERCLA, a plaintiff must establish that: (1) the defendant is a responsible person as defined by CERCLA; (2) the site is a facility[4]; (3) there has been a release or threatened release of a hazardous substance at the facility; (4) the plaintiff has incurred response costs in connection with that release; and (5) the response costs incurred were necessary and consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") set up under

---

4. A facility is defined under CERCLA as (a) any building, structure, installation, equipment, pipe or pipeline, well, pit, pond, lagoon, impoundment, ditch, landfill storage container, motor vehicle, rolling stock, or aircraft, or (b) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.... 42 U.S.C. § 9601(9).

CERCLA and administered by the Environmental Protection Agency ("EPA") in order to prioritize hazardous substance release sites throughout the nation. 42 U.S.C. § 9607(a); *Shore Realty, supra,* at 1043.

"Covered persons" under CERCLA are classified into four categories: (1) the owner and operator of a vessel or a facility; (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances at any facility; and, (4) any person who accepted any hazardous substances for transport to disposal or treatment facilities from which there was a release or a threatened release. 42 U.S.C. § 9607(a). A covered person may include an individual, corporation, or partnership. 42 U.S.C. § 9601(21).

There are three affirmative defenses available under CERCLA to these covered persons where it can be shown that the release or threatened release of hazardous substances were caused solely by: (1) an act of God; (2) an act of war; or (3) an act or omission of a third party other than an employee or agent of the covered person or where the act or omission occurs in connection with a contractual arrangement if the covered person can establish that he exercised due care with respect to the hazardous substance concerned, and he took precautions against foreseeable acts or omissions of the third party. 42 U.S.C. § 9607(b). The statute also provide that any combination of the first three affirmative defenses may be asserted as a defense. 42 U.S.C. § 9607(b)(4).

### 1. *Witben Realty Corporation*

APU seeks to hold Witben liable under CERCLA as the current owner of the Union Road Site. Witben, while conceding to be the owner of the Union Road Site, argues that it is entitled to the third party/innocent purchaser defense set forth under Section 9607(b) of CERCLA.

Witben, formed in 1960, has been a wholly owned subsidiary of Universal Marion since shortly after its inception in 1960. Witben acquired the property which includes the Union Road Site from four couples, friends of Wolfson and his brother, who in turn had acquired the property from Wolfson on December 21, 1959. Wolfson acquired the property from the New York Central Railroad on December 18, 1959.

APU has established a prima facie case for liability under CERCLA against Witben as a current owner. There is no genuine issue of material fact that Witben is a covered person, as Witben is the current owner of the property which includes the Union Road Site, 42 U.S.C. § 9607(a)(1); that the Union Road Site is a facility as defined by CERCLA; that there has been a release or threatened release of hazardous substances at the Union Road Site; that APU has incurred response costs in connection with that release; and that the response costs incurred were necessary and consistent with the NCP. Therefore, in order to defeat liability under CERCLA, Witben must successfully assert one of the three affirmative defenses available under CERCLA. In this case, Witben claims that it is an innocent purchaser of the property, was not responsible for any of the hazardous substances found on the property, and thus should not be liable for any response costs incurred to clean up such property.

As stated above, under the third-party defense set forth in CERCLA § 9607(b)(3), a defendant is not liable if it establishes that the release or threatened release was caused solely by:

an act or omission of a third party other than a defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances [the "Due Care Requirement"], and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result for such acts or

omissions [the "Precautionary Requirement"].

A contractual relationship, for purposes of CERCLA, includes "land contracts, deeds or other instruments transferring title or possession." 42 U.S.C. § 9601(35)(A). However, an affirmative defense may be raised relating to a contractual relationship where:

the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility and.... [a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

42 U.S.C. § 9601(35)(A).

Additionally, the innocent purchaser defense, like the third-party defense, is available to some owners who acquired the property after the disposal or placement of hazardous waste occurred. To qualify as an innocent purchaser under CERCLA, one must have undertaken "all appropriate inquiry into the previous ownership and uses of the property, consistent with good commercial or customary practice" at the time of transfer. 42 U.S.C. § 9601(35)(B). " 'Good commercial or customary practice' is not defined in the statute, and the relevant legislative history is vague, indicating that 'a reasonable inquiry must have been made in all circumstances, in light of best business and land transfer principles.' " *United States v. A & N Cleaners and Launderers, Inc.*, 854 F.Supp. 229, 238 (S.D.N.Y.1994) (citing H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess., at 187 (1986)). Owners who meet the requirements of 42 U.S.C. § 9601(35) will not be found to be in a "contractual relationship" with the party responsible for the release of hazardous substances at the property. *United States v. A & N Cleaners and Launderers, Inc., supra*, at 238. In addition, to be able to assert and prevail on the innocent purchaser defense, an owner must also meet the Due Care and Precautionary Requirements of CERCLA § 9607(b)(3)(a) and (b). *United States v. A & N Cleaners and Launderers, Inc., supra*, at 238.

Under the Due Care Requirement, a defendant must show that it took necessary steps to prevent foreseeable adverse consequences arising from the pollution on the site. *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 & n. 3 (7th Cir.1994). To satisfy the Precautionary Requirement, a defendant must establish that it took precautionary action against the foreseeable actions of any third parties responsible for the hazardous substances on the property. *United States v. Monsanto Co.*, 858 F.2d 160, 169 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Finally, a defendant must prove its affirmative defense by a preponderance of the evidence. *City of New York v. Exxon Corp.*, 766 F.Supp. 177, 195 (S.D.N.Y.1991).

Witben argues that the release or threat of release of the hazardous substances at the Union Road Site was caused solely by the acts or omissions of APU (through its predecessor corporations Penn Central and New York Central Railroad); that the hazardous substances were placed on the property prior to the purchase of any portion of the property by Witben; that Witben did not know, nor did it have any reason to know at the time of purchase that hazardous substances were or had been disposed of on the property; and, that at the time of purchase in 1960, Witben made all appropriate inquiries into the previous ownership and usage of the property consistent with practice at that time. Witben also asserts that it has met the Due Care and Precautionary Requirements applicable under CERCLA.

It is undisputed that New York Central Railroad (APU's predecessor) engaged in dumping activities at the Union Road Site at least during the period from 1950 until 1960. Railroad cars carrying drums of waste, such as oil, spoiled food, sludge and scrap were routinely dumped into a pit located on the property approximately once a month, with other items, such as stone and bricks, being dumped in the interim. According to Edmund Wesolowski, a laborer for the New York Central Railroad, the drums used to transport the materials for dumping were not left in the pit, but were emptied and then

reused by the railroad, although Witben claims that Wesolowski's statement that, "you received a carload of something—some contractor received a carload of something and he has a barrel of some kind of rubbish, he threw it in there, got rid of it" means that the barrel was also disposed of into the pit. Affidavit of Craig A. Slater, dated May 22, 1995, at p. 22, ¶ 68–69. It is also undisputed that, in 1982, the DEC located fifty-six drums at the Union Road Site, and samples of the water at the site revealed the presence of hazardous waste, and that, in 1986, after a period of inaction, the DEC located eighty-one drums at the Union Road Site. Witben again argues that, in 1982, the fifty-six drums were discovered as a result of a visibility inspection while, in 1986, the eighty-one drums were found as the result of a thorough inspection. Affidavit of Craig A. Slater, at pp. 22–23, ¶¶ 71–73.

It is largely undisputed that the Union Road Site was not closed off by Witben, although Universal Marion did put up concrete berms during times after 1973 which were knocked down by "big trucks." Affidavit of Richard M. Gray, dated November 7, 1994, at p. 31. However, no warning signs were erected by Witben, nor were any security personnel retained to police the area against trespassers, until the Town of Cheektowaga, after repeated requests to Witben and Universal Marion, finally, in 1986, at its own expense, erected a fence around the area. Later, the EPA cordoned off the area, erecting a high visibility fence and hazardous waste warning signs around the containment area. Universal Marion's attorney, Charles Maxwell, Esq., and Universal Marion's real estate agent, James Oppenheimer, acting for Witben, both indicated that they were aware of unauthorized dumping by local contractors on the property, with Oppenheimer stating that "during Witben's ownership in the 1980's, some illegal dumping of non-hazardous household wastes began to take place on the property." Oppenheimer Affidavit, dated April 12, 1995, at p. 7, ¶ 23. Richard M. Gray, President of Universal Marion from 1973 until the present time stated that, "this piece of land—the contractors were dumping and we had been contacted by the county or

the city officials." Affidavit of Richard M. Gray, dated November 7, 1994, at p. 30.

By 1986, the DEC found that tar-like material had migrated out of the containment area to the adjacent banks of Slate Bottom Creek, where, after testing, hazardous substances were found, such as oil and grease, lead, copper, and chromium, with the highest concentration of the hazardous substance being lead. At that time, the cost of the remediation was estimated to be approximately $500,000; by 1994, the cost was estimated to be approximately $11 million. From 1986 until the present, it is clear that Witben did nothing to prevent additional illegal dumping, and that weather factors conspired to continue a deterioration of the drums at the site, causing their contents to leak into the environment.

■ The court finds, after a review of the undisputed material issues of fact, that Witben is not entitled to assert the third party affirmative defense. While there is a significant dispute as to whether the presence of the hazardous substances discovered at the Union Road Site can be attributed solely to APU, or partially to Witben, as the current owner, there is no question but that Witben did not exercise due care after the discovery of the hazardous substances on the property.

■ In order to successfully assert the innocent purchaser defense, a defendant must show that (1) it acquired the facility after the initial deposit of the hazardous substances; (2) at the time of its acquisition, it did not know and had no reason to know that any hazardous substance was deposited at the facility; and, (3) once the presence of the hazardous substance became known, it exercised due care. *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 903 F.Supp. 273, 276 (D.R.I.1995). *See also Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 964 F.2d 85, 90 (2d Cir.1992). Witben, while possibly being able to meet the first two steps of this test, clearly cannot prove that it exercised due care once it became aware of the presence of hazardous substances at the Union Road Site in 1982.

In *United States v. DiBiase*, 45 F.3d 541 (1st Cir.1995), a successor landowner was

found liable to pay for a portion of the remediation costs associated with a hazardous waste dumping site located on the property. In that case, the owner of the property from 1946 until 1969 permitted the South Essex Sewerage District ("SESD") to dump sewerage wastes into unlined "sludge pits" which were surrounded by earthen berms and fences. SESD maintained the site during that period. In 1969, a large tract of land encompassing the site was sold to DiBiase. When SESD attempted to dump at the site in 1970, unaware that ownership of the land had changed, DiBiase informed them that such dumping would no longer be permissible. Thereafter, during the 1970's DiBiase received correspondence from various municipal agencies relating to the dump site, "expressing concern over the unrestricted access to the Site and the random dumping that was taking place." *DiBiase, supra,* at 543. DiBiase erected gates at the entrances to the property, but did not maintain them, and the random dumping continued. In 1980, although DiBiase was informed that he would be held liable for conditions at the site if he did not take action, he failed to install new gates after he agreed to do so, and made no effort to maintain the earthen berms and interior fencing around the sludge pits which had "completely decayed." *DiBiase, supra,* at 543. In 1987, when heavy rains occurred, the sludge pits overflowed causing the waste to run into nearby wetlands, an "easily foreseeable" occurrence. *DiBiase, supra,* at 543. DiBiase was subsequently held liable for a portion of the remediation costs. The First Circuit, in affirming a consent decree entered in the action, holding DiBiase liable for 15% of the response costs, stated that:

To be sure, SESD played a leading role in the contamination of the Site and [DiBiase], who came on the scene later, played an appreciably less prominent role. But, an actor cast in a bit part is not to be confused with a mere spectator, whose only involvement is to lounge in the audience and watch events unfold. [DiBiase] contributed to the 1987 incident in a variety of ways. Despite being warned of a potentially dangerous condition, he twiddled his thumbs; he failed to safeguard the Site, thus permitting third parties to dump

at will and exacerbate an already perilous situation; fiddled while the earthen berms deteriorated; and turned a blind eye to evolving public health and safety concerns. *DiBiase, supra,* at 545.

■ Similarly, in this case, Witben, while purchasing the property after the New York Central Railroad had been continually dumping at the Union Road Site for many years, did nothing when informed of unauthorized dumping at the Site by third parties except to erect berms which were concededly knocked down by big trucks, and, upon being informed as early as 1982 of the discovery of the hazardous waste dump site, failed to cooperate in sealing off the area, and did not engage in any affirmative action to guard against a potentially dangerous situation, allowing over ten years to go by while various environmental agencies investigated the situation, during which time foreseeable weather conditions caused the hazardous waste to migrate. In fact, upon learning of the hazardous situation, Witben, and Universal Marion, decided to cease paying property taxes at the Site, hoping that County or Town officials would foreclose on the Site and take away any ownership responsibility. The court finds that Witben's actions in this matter did not constitute "due care," rather, Witben attempted to distance itself from the situation and to relieve itself of any potential liability in the matter. The fact that APU, as the successor to Penn Central and New York Central Railroad, may have "played a leading role in contamination of the [Union Road Site]," *see DiBiase, supra,* at 545, does not alleviate Witben's responsibility to the site, especially where Witben contributed to the spreading contamination through its deliberate inaction. As such, the court finds that Witben is not entitled to the third-party/innocent purchaser affirmative defense, and that, as the current owner of the property, Witben is liable under CERCLA.

### 2. *Universal Marion Corporation*

APU seeks to hold Universal Marion, like Witben, liable as both the current owner and current operator of the Union Road Site, arguing that under federal common law, its relationship with Witben and its control of

Witben would allow the court to pierce Witben's corporate veil and cast Universal Marion, its sole shareholder, in liability under CERCLA. APU also seeks to hold Universal Marion liable as both an owner and operator of a facility at a time when hazardous wastes were being disposed.[5] Universal Marion argues that APU cannot establish a prima facie case against it as it is not a covered person within the meaning of CERCLA.

### a. Universal Marion's capacity to be sued

Initially, Universal Marion argues that it cannot be sued by APU as it is a dissolved corporation. APU contends that, while Universal Marion is in the process of dissolving, it has not yet completed the dissolution process, and can, therefore, be sued.

Universal Marion is a corporation organized under the laws of the State of Florida. According to Richard M. Gray, President of Universal Marion, Universal Marion was dissolved pursuant to a resolution adopted by the directors of the corporation on November 2, 1984, and adopted by the shareholders of the corporation on November 30, 1984. *See* Exhibit F, Affidavit of Richard M. Gray, dated April 10, 1995. The Articles of Dissolution, noting that, under Section 607.297 of the Florida General Corporation Act, any suit against a dissolving corporation must be brought within three years after the date of the dissolution, specifically stated that "[t]he board of directors is proposing the dissolution of the company in order to commence the running of such three year limit on initiation of new suits against the company." *See* Affidavit of Richard M. Gray, at p. 5, ¶ 13.

As of December 31, 1983, Universal Marion had assets with a value of $1,966,180 of which $1,281,883 was in the form of certificates of deposit and cash. As of December 31, 1984, Universal Marion had assets with a value of $1,354,873 of which $832,883 was in the form of cash or cash equivalents. A liquidating dividend was paid to the shareholders between December 31, 1983 and December 31, 1984. *See* Deposition of Richard M. Gray, APU's Notice of Motion for Partial Summary Judgment, at pp. 23–28. According to counsel for Universal Marion, Craig A. Slater, Esq., Universal Marion still holds assets, including movie rights, $200–400 thousand in cash and cash equivalents, and the Witben stock.

The language of CERCLA that provides for liability "notwithstanding any other provision or rule of law," 42 U.S.C. § 9607(a), conflicts with Fed.R.Civ.P. 17(b) which states that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." *AM Properties Corp. v. GTE Products Corp.*, 844 F.Supp., 1007, 1011 (D.N.J.1994). While courts have disagreed as to the liability of dissolved corporations under CERCLA as to whether CERCLA preempts state capacity laws, the majority of the courts have held that CERCLA preempts state capacity statutes to the extent their operation would shield a dissolved corporation from CERCLA liability. *Compare Hillsborough County v. A & E Road Oiling Service*, 877 F.Supp. 618, 621–22 (M.D.Fla.1995); *AM Properties Corp. v. GTE Products Corp.*, *supra*, at 1011–12; *BASF Corp. v. Central Transport*, 830 F.Supp. 1011, 1012–13 (E.D.Mich.1993); *Chesapeake and Potomac Tel Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1285, 1291 (E.D.Va.1993); *United States v. Sharon Steel Corp.*, 681 F.Supp. 1492 (D.Utah 1987) (cases holding that CERCLA preempts state capacity statutes) *with Louisiana–Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431, 433–34 (9th Cir. 1993); *Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 817 F.2d 1448 (9th Cir. 1987). Neither the Second Circuit nor any district court within the circuit has ruled on this issue.

■ The reasoning followed by the majority of courts is that Congress intended that CERCLA provide for broad liability, and that CERCLA should supersede other laws or rules that would ordinarily limit that liability. *BASF Corp.*, *supra*, at 1013. Further, these courts have reasoned that, because environmental cleanup may occur years after the activities that caused the pollution, mere dissolution should not be allowed to block further inquiry into the status of the identifiable resources of the companies

---

**5.** This issue will be discussed in Section 4 of this

Decision and Order.

responsible for that pollution. *BASF Corp., supra,* at 1013. This is in contrast to the reasoning espoused by the Ninth Circuit which believes that such an interpretation of CERCLA would prevent courts from looking to state law to determine whether a dissolved corporation could be sued in any case involving a federal cause of action, and that the risk of state corporate-capacity statutes operating to preclude CERCLA liability is inherent in the language of Fed.R.Civ.P. 17(b). *ASARCO, Inc., supra,* at 434. This court finds the reasoning employed in the *BASF Corp.,* and the other similar holdings, to be more persuasive, and concludes that the holdings of the majority of the courts should be followed, and that state statutes governing the capacity of a dissolved corporation to be sued are preempted by the overall purposes of CERCLA.

However, the court must also determine whether Universal Marion possesses assets that would make it amenable to suit under CERCLA. Two general approaches to the issue of whether CERCLA liability may be imposed on a dissolved corporation whose assets have been completed distributed have been used. Under the first approach, the majority of courts have drawn a distinction between a "dead" and a "dead and buried" corporation. A "dead" corporation is one that is dissolved but has not yet distributed its assets. A "dead and buried" corporation is one that has distributed all of its assets to its shareholders. *AM Properties Corp. v. GTE Products Corp., supra,* at 1012.

The courts adopting the first approach have concluded that a "dead and buried" corporation cannot be included within the definition of a liable "person" under CERCLA, 42 U.S.C. § 9607(a)(2) because

> [i]n such a case there is no entity to sue or to defend against a lawsuit, and any judgment entered by the court would be unenforceable much less uncollectible.

*Traverse Bay Area Intermediate School Dist. v. Hitco, Inc.,* 762 F.Supp. 1298, 1301 (W.D.Mich.1991).

Under the second approach, courts have held that CERCLA liability of a dissolved corporation should not hinge on whether the dissolved corporation has already distributed its assets. *see, e.g., United States v. SCA Services of Indiana, Inc.,* 837 F.Supp. 946, 953–56 (N.D.Ind.1993), reasoning that the goals of CERCLA would be "entirely frustrated by any interpretation of a statute which allowed a corporation to merely dissolve itself and distribute its assets prior to the filing of a CERCLA action in order to completely absolve itself of any liability under the statute." *Allied Corp. v. Acme Solvents Reclaiming, Inc.,* 1990 WL 322940 at *5 (N.D.Ill.1990).

■ Following the majority of courts, this court finds that CERCLA liability cannot be precluded as to a corporation that has been dissolved, but whose assets have not yet been fully distributed, *i.e.* a "dead" corporation. *See, e.g., Hillsborough County, supra,* at 622; *AM Properties Corp., supra,* at 1013. *See also Stychno v. Ohio Edison Co.,* 806 F.Supp. 663, 670 (N.D.Ohio 1992) (stating that "[w]hether a [sic] inactive corporation falls within the scope of the definition of 'person' under CERCLA necessarily depends upon whether that corporation still holds assets"). As it is clear that Universal Marion still holds assets in the form of cash or cash equivalents, stock in a subsidiary company, and movie rights, and that CERCLA preempts state law as to a corporation's ability to be sued, Universal Marion may be liable under CERCLA, despite the fact that it dissolved in 1984.

**b. Liability of Universal Marion under CERCLA**

Under CERCLA § 9607(a), liability for response costs may be imposed on various classes of responsible persons, including past and present owners or operators of facilities, transporters of hazardous substances, and those who generate or arrange for the disposal or treatment of hazardous substances. "Owner" liability and "operator" liability are two distinct concepts. *State of New York v. Solvent Chemical Co., Inc.,* 875 F.Supp. 1015, 1019 (W.D.N.Y.1995). A corporation may be held liable as the owner of another corporation under circumstances warranting "piercing the corporate veil." *Lansford–Coaldale Joint Water Authority v. Tonolli Corp.,* 4

F.3d 1209, 1224–25 (3d Cir.1993). Additionally, an affiliated corporation may be held liable as an operator when it is "deemed ... to have had substantial control over the facility in question." *Lansford–Coaldale Joint Water Authority, supra,* at 1220.

### (i) Owner Liability

The claim that Universal Marion is liable as the parent of Witben is based upon piercing Witben's corporate veil, thereby characterizing Universal Marion as an owner under CERCLA. *United States v. Kayser–Roth,* 724 F.Supp. 15, 23 (D.R.I.1989), *aff'd,* 910 F.2d 24 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). Whether or not a corporation is liable under corporate veil-piercing standards should be analyzed under federal common law, since " '[i]t is well established that when a federal statute is silent as to the choice of law to be applied, but overriding federal interests exist, courts should fashion uniform federal rules of decision.' " *City of New York v. Exxon Corporation,* 112 B.R. 540, 552–53 (S.D.N.Y.1990), *aff'd in part,* 932 F.2d 1020 (2d Cir.1991). "In considering whether or not to pierce the corporate veil under CERCLA, courts have considered several factors, including, in approximate descending order of importance: (1) inadequate capitalization in light of the purposes for which the corporation was organized; (2) extensive or pervasive control by the shareholder or shareholders; (3) intermingling of the corporation's properties or accounts with those of its owner; (4) failure to observe corporate formalities and separateness; (5) siphoning of funds from the corporation; (6) absence of corporate records; and, (7) nonfunctioning officers or directors." *City of New York v. Exxon Corp., supra,* at 553 (quoting *In re Acushnet River & New Bedford Harbor Proceedings,* 675 F.Supp. 22, 33 (D.Mass.1987)). "No one of these factors is either necessary or sufficient to disregard corporate separateness. The equitable decision to pierce the veil is dependent on the facts peculiar to each case." *Acushnet, supra,* at 33.

According to APU, Universal Marion should be held liable under CERCLA as the parent corporation of Witben based on the following factors: (1) Universal Marion is the sole shareholder of Witben, holding 100% of Witben's stock since 1960; (2) Universal Marion has filed consolidated tax returns with Witben since at least the early 1970's; (3) Universal Marion and Witben have shared a common business office since at least 1973; (4) Universal Marion finances Witben as evidenced by the fact that Universal Marion paid the property taxes assessed for property owned by Witben, including the parcels which fall within the boundaries of the Union Road Site from at least 1973 through 1983; (5) employees of Universal Marion, and Universal Marion's attorney have worked on the business affairs of Witben while being paid by Universal Marion; (6) any sales of property owned by Witben were discussed at Universal Marion board meetings, and the proceeds from such sales were deposited in Universal Marion's bank accounts, leaving Witben with no cash flow; (7) day-to-day managing of Witben properties was handled by Universal Marion employees and agents; (8) Witben did not keep separate books and records, nor did it hold separate board meetings; all Witben business was discussed at Universal Marion board meetings; (9) Witben did not keep separate bank accounts, instead utilizing the bank accounts of Universal Marion; and (10) the officers and directors of Witben were also the officers and directors of Universal Marion.

Universal Marion does not dispute APU's assertions as to the factors set forth above. Rather, it argues that APU's characterization of these factors as determinative of Universal Marion's control over Witben is a misrepresentation of the facts. Agreeing that Universal Marion and Witben have common officers and offices for parent and subsidiary, and consolidated tax returns, Universal Marion states that these facts only establish that Universal Marion and Witben "operated their affairs according [to] standard business practices applicable to parent and subsidiary corporations." *See* Defendants Witben, et al, Memorandum of Law, dated May 23, 1995, at p. 42. Universal Marion's payment of property taxes for Witben on the Union Road property is alleged to be "due to an uncorrected mistake by the Tax Assessor regard-

ing the ownership of the property." *See* Defendants Witben, et al, Memorandum of Law, dated May 23, 1995, at p. 42. The discussion of sales of property at Universal Marion board meetings is stated to be "not unusual in subsidiary relationships and ... ultimately irrelevant to the inquiry of 'control.'" *See* Defendants Witben, et al, Memorandum of Law, dated May 23, 1995, at p. 42.

Universal Marion also asserts that Witben is fully and separately capitalized, but it does not address the fact that only one bank account was kept which both Universal Marion and Witben utilized, and that any proceeds of sales of Witben property were deposited in this joint account. As to the Universal Marion personnel who also handled property transactions for Witben, Universal Marion simply states that "the fact that [the park manager] performed some tasks for the subsidiaries while being paid by Universal is hardly enough to support the 'control' theory espoused by APU." *See* Defendants Witben, et al, Memorandum of Law, dated May 23, 1995, at p. 43. Finally, Universal Marion contends that, as it was in voluntary liquidation as of 1971, and Witben was only a landowner, it would not have made sense to maintain separate accounts, and to have separate shareholder meetings and board meetings. *See* Defendants Witben, et al, Memorandum of Law, dated May 23, 1995, at p. 45.

In *City of New York v. Exxon Corp., supra*, the court found that a parent corporation, Refinement, was liable for the acts of its subsidiary, Newtown, a generator and transporter of hazardous waste which was taken to the City of New York's landfills. In holding Refinement liable, the court noted that Newtown's board of directors, which consisted of Refinement's officers and directors, never met; that Newtown's customers occasionally communicated directly with Refinement, indicating that corporate separateness was not strictly observed; that Refinement paid the president of Newtown's salary; that Refinement contributed over $3 million to Newtown's operations; that Refinement guaranteed at least two of Newtown's loans and paid its insurance; and that Refinement's approval was required for all of Newtown's major financial undertakings. *Exxon*

*Corp., supra*, at 553. The court also noted that Newtown's assertion that corporate formalities were always observed was "plainly self-serving" and conclusory. *Exxon Corp., supra*, at 553.

■ The court finds that the facts set forth in *Exxon Corp.* are similar to the facts in this case. It is clear that Universal Marion comingled all of its funds with that of its subsidiary, Witben, by virtue of the fact that it only had one bank account. Therefore, Universal Marion, with its own money, along with proceeds of sale of properties belonging to Witben, which were not kept separate, paid all of Witben's expenses, including the property taxes on the Union Road Site. Neither the board of directors of Witben nor its shareholders ever met; thus, no corporate formalities as to Witben were maintained. Rather, any business relating to Witben was conducted at Universal Marion board of directors and shareholders meetings. There is no evidence of any payroll for Witben, rather, personnel working on Witben business were employees, agents, or independent contractors of Universal Marion. Indeed, Witben did not have its own office, and its affairs were run out of the Universal Marion office with Universal Marion personnel. As such, the court finds that Witben's corporate veil should be pierced to hold Universal Marion liable as a current owner because of the control which Universal Marion holds over Witben.

**(ii) Operator liability**

■ A parent corporation may not be held liable under CERCLA as an operator based solely on its status as a shareholder. *Kayser–Roth Corp.*, 724 F.Supp. at 22. "The parent corporation's control over the subsidiary's management and operations is an essential element of proving operator liability on the parent's part." *Kayser–Roth Corp.*, 724 F.Supp. at 22 (citing *United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 744 (8th Cir.1986)).

It has previously been found above that Witben is a potentially responsible person under CERCLA. It has also been found above that Universal Marion exercised significant control over Witben, its subsidiary.

When determining whether a parent corporation may be directly liable under CERCLA for the actions of its subsidiary, the issue is whether the parent corporation exercised control over the subsidiary's management and operations sufficient to find that the parent corporation was a de facto operator. *Kayser–Roth Corp.*, 724 F.Supp. at 22.

Courts have established two different standards for the imposition of operator liability: the "actual control" test and the "authority to control" test. Under the "actual control" test, a corporation will be held liable as an operator for the environmental violations of another corporation when there is evidence of substantial control exercised by one corporation over the activities of the other. *Kayser–Roth*, 910 F.2d at 27. In contrast, under the "authority to control" test, operator liability is imposed as long as one corporation had the capacity to control, even if it was never utilized. *Lansford–Coaldale Joint Water Authority, supra,* at 1221; *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). While the Second Circuit has not yet ruled on the issue, district courts within the circuit have applied the "actual control" test as opposed to the "authority to control" test. *See City of New York v. Exxon Corp., supra,* at 547 n. 9.

Many of the factors used in holding Universal Marion liable as an owner are relevant to the determination of the issue of operator liability.

■ There is no evidence in the record that Witben had any employees. Rather, any business to be conducted on behalf of Witben was handled by individuals employed by Universal Marion, or individuals paid by Universal Marion. Decisions on sales of assets of Witben were discussed at Universal Marion board meetings, and proceeds from such sales were deposited into a joint account held by Universal Marion. Importantly, upon the discovery in 1982 of a hazardous waste site on the property owned by Witben, the matter was handled by Universal Marion officers and an attorney retained by Univer-

sal Marion, and the cost of the testing of the site by an environmental concern was paid by Universal Marion. Indeed, a key decision not to pay the property taxes due on the parcel on which the hazardous waste site is located was made by the Universal Marion board of directors upon a suggestion by Richard M. Gray, the president of Universal Marion.

Accordingly, the court finds that Universal Marion exercised such extensive control over Witben, and was so sufficiently involved in the affairs of Witben, that it should be held directly liable under CERCLA as a current operator.

Additionally, as to all of the theories of liability discussed as to Universal Marion, the court finds that, for the reasons outlined in Section 1 as to Witben, which the court will not repeat here, Universal Marion cannot assert the affirmative defense of a third party/innocent purchaser under CERCLA § 9607(b).

### 3. *Louis E. Wolfson*

APU seeks to hold Louis E. Wolfson ("Wolfson"), like Witben, liable as a current operator of the Union Road Site because of his authority to control Witben's and Universal Marion's operations. APU also seeks to hold Wolfson liable as both an owner and operator of a facility at a time when hazardous wastes were being disposed.[6] Wolfson argues that APU cannot establish a prima facie case against him as he is not a covered person within the meaning of CERCLA. Additionally, Wolfson contends that summary judgment should be granted in his favor as there was no disposal of hazardous wastes at the Site during the three days in which he owned the property in 1959; that he is not liable under a "passive discharge" theory as an owner; and, that he is shielded from liability under CERCLA by the third party/innocent purchaser defense under 42 U.S.C. § 9607(b)(3). Wolfson also asks that APU's claims for CERCLA contribution and state law contribution be dismissed.

Wolfson first purchased the relevant 269 acre property on which the Union Road Site

---

**6.** This issue will be discussed in Section 4 of this Decision and Order.

now stands on December 18, 1959. On December 21, 1959, Wolfson conveyed his interest in this property to four couples who soon after conveyed their interest in the property to Witben. Wolfson, an investor domiciled in Florida, purchased the property for future development allegedly without personally travelling to Buffalo, New York,[7] but through the advice of Leon Kaye, a real estate professional associated with Universal Marion.

Universal Marion was formed in the 1950's, and Wolfson owns approximately 11–15% of Universal Marion common stock. *See* Affidavit of Louis E. Wolfson, dated April 11, 1995, at p. 4, ¶ 13. Combining his interest in Universal Marion with that of his brothers and other family members, the family block has held a total of between 36 and 39 percent of Universal Marion stock through the 1960's, 1970's and 1980's. Deposition of Louis E. Wolfson, APU's Notice of Motion, p. 15; Exhibit 50 to APU's Notice of Motion, Volume II, at p. 2. Wolfson, while never an officer or director of Universal Marion, acted as a paid consultant for Universal Marion, and the officers and directors of Universal Marion were individuals with whom Wolfson had business and personal relationships. Wolfson was informed on any major decisions pertaining to the operation of Universal Marion, such as the acquisition of other companies. Deposition of Louis E. Wolfson, at p. 10–11. According to Wolfson, he was most active in the operations of Universal Marion in the 1950's, and was more active in other corporations such as the Merritt–Chapman & Scott Corporation in the 1960's. Deposition of Louis E. Wolfson, at p. 12–13. In the 1970's, when Universal Marion was in voluntary liquidation, Wolfson claimed that he had "very little contact with [Universal Marion] other than on financial matters they would discuss with me." Deposition of Louis E. Wolfson, at p. 14.

However, an examination of the Notice of the Annual Meeting of Universal Marion Shareholders, dated March 26, 1975, Exhibit 50, APU's Notice of Motion, Volume II, at p. 3, shows a clear statement that Wolfson "was and is in almost daily contact with the operating officers of the Corporation who are responsible for the general supervision of the business policies and affairs of the Corporation," and that Wolfson made "recommendations to the operating officers and to the Board of Directors," and that "[t]he consulting services performed by Louis E. Wolfson related to all activities and operations of the Corporation." Notice of the Annual Meeting of Universal Marion Shareholders, dated March 25, 1977, Exhibit 52 at p. 3. These representations were contained in all of the Annual Meeting notices for Universal Marion. Further, in each such Notice, Wolfson's recommendations to the stockholders, as the 11% shareholder, and therefore, the controlling shareholder, were printed. Nonetheless, according to Wolfson, he did not advise Universal Marion or the individuals associated with that corporation as to what to do with the Buffalo property or how to manage it. Deposition of Louis E. Wolfson, at p. 84.

Monteen Tomberlin, the corporate secretary of Universal Marion, began her employment with the Wolfson Family Foundation, of which Wolfson was the Chairman of the Board of Trustees, in approximately 1951 holding a position as a corporate secretary. Deposition of Monteen Tomberlin, APU's Notice of Motion, at p. 9, 102. In 1956, Tomberlin became Secretary of Universal Marion. Deposition of Monteen Tomberlin, at p. 11. According to Tomberlin, the officers and directors of Universal Marion were all associates of Wolfson. Deposition of Monteen Tomberlin, at p. 24. Tomberlin also noted that Wolfson and his family voted their Universal Marion stock in a block, and she could not recall any dissension between members of the family. Deposition of Monteen Tomberlin, at p. 15.

Richard M. Gray, the president of Universal Marion from 1973 until the present, was a Certified Public Accountant who did work for Universal Marion and Wolfson prior to his

---

7. Julia Boyer Reinstein, a Cheektowaga, New York resident, who owned property adjacent to the old New York Central Railroad property, claimed at her deposition that she had met Wolfson twice when he visited the area and met with her husband. *See* Deposition of Julia Boyer Reinstein, APU's Notice of Motion, at pp. 17–20. Wolfson denies that he was ever in Buffalo.

accepting a position with that corporation.[8] Deposition of Richard M. Gray, APU's Notice of Motion, at p. 8. Gray also became President of Merritt–Chapman & Scott, another corporation in which Wolfson held stock, in approximately 1976. Deposition of Richard M. Gray, at p. 15. Gray also handled other accounting work on behalf of Wolfson. Deposition of Richard M. Gray, at p. 62. Gray claimed, however, when asked whether he discussed Universal Marion operations with Wolfson that he "represent[ed] Wolfson in other matters as a C.P.A., and discussion of Universal Marion might have come up ... I don't know." Deposition of Richard M. Gray, at p. 62.

The attorney who represented Universal Marion and Witben in their dealings with the DEC stated at his deposition that he had never met with nor spoken with Louis Wolfson. Deposition of Charles Maxwell, APU's Notice of Motion, at p. 68.

An examination of the minutes from committee meetings and board of director meetings of Universal Marion reveals that Wolfson did not attend such meetings, and no express mention of any recommendations made by Wolfson was ever made at such meetings. Exhibits to APU's Notice of Motion, Volume II.

It is well settled that, in certain circumstances, an officer or shareholder of the corporate owner of a facility can be liable as an "operator" under CERCLA even if the traditional requirements for piercing the corporate veil are not met. *Levin Metals v. Parr–Richmond Terminal,* 781 F.Supp. 1454, 1455 (N.D.Cal.1991); *Columbia River Service Corp. v. Gilman,* 751 F.Supp. 1448, 1454 (W.D.Wash.1990); *New York City v. Exxon Corp.* 112 B.R. at 545–49. Generally, "courts have been willing to impose CERCLA liability upon a non-owner of the property only if the party either: (1) actually participated in the operations of the facility, or (2) actually exercised control over, or was otherwise intimately involved in the operations of, the corporation immediately responsible for the operation of the facility. *Levin Metals, supra,* at 1456.

In *Levin Metals,* the officer and minority shareholder was held not personally liable as a CERCLA "operator" absent any contention that the officer in fact participated in the actual management of the facility, exercised control over the affairs of the operator, or that he was intimately involved in their operations. *Levin Metals, supra,* at 1458. In contrast, CERCLA liability has been imposed on shareholders who actually participated in management of the corporate owner or operator. *See Donahey v. Bogle,* 987 F.2d 1250, 1254 (6th Cir.1993) (imposing CERCLA liability on sole shareholder of corporation because "he had authority to prevent the contamination of the property by his corporation"); *New York v. Shore Realty,* 759 F.2d 1032, 1052 (2d Cir.1985) (imposing liability on sole shareholder and officer of corporation who was "in charge" of its management); *United States v. Amtreco,* 809 F.Supp. 959 (M.D.Ga.1992) (imposing liability on president, sole director, and shareholder of corporation who actively participated in its management, hired and fired employees, dealt with customers, and maintained an office on site); *Vermont v. Staco,* 684 F.Supp. 822, 832 (D.Vt.1988) (imposing liability on individual defendants, as owning and managing shareholders).

In this case, Wolfson attempts to portray himself as a hands-off consultant to Universal Marion, who was simply available for discussion on an as-needed basis. Testimony from Richard Gray and Monteen Tomberlin, along with other evidence in the record, also seeks to establish that Wolfson, while familiar with Universal Marion matters, was only consulted if it was deemed necessary. However, the record also provides evidence that every officer and director of Universal Marion knew Wolfson prior to taking their positions with Universal Marion, and, in fact, worked for Wolfson in other capacities besides their job functions at Universal Marion, *e.g.,* James Mullaney worked as Wolfson's C.P.A., Richard M. Gray worked as Wolfson's C.P.A., Monteen Tomberlin worked as a secretary for other Wolfson interests. Additionally, the record establishes that Wolf-

---

**8.** Universal Marion's previous president, James Mullaney, was also a C.P.A. who did work for Wolfson. Deposition of Monteen Tomberlin, APU's Notice of Motion, at p. 22.

son was the controlling shareholder of Universal Marion, and it was represented to all Universal Marion shareholders that Wolfson was in contact with the management of Universal Marion on a daily basis, and that he made recommendations to the operating officers and to its board of directors.

In considering a record on a motion for summary judgment, a district court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it may not properly grant summary judgment where the issue turns on the credibility of the witnesses. *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 516 (2d Cir. 1994). Any assessments of credibility and all choices between available inferences are matters to be left for a jury, not matters to be decided by the court on summary judgment. *Azrielli, supra,* at 516. For example, although no evidence directly establishes that Wolfson's recommendations to the directors and officers of Universal Marion were routinely followed, other evidence, *e.g.* Wolfson's significant shareholder status, and the fact that, according to Monteen Tomberlin, the officers and directors found Wolfson to be "smarter than anybody we had ever known," and that the officers and directors "sometimes would seek advice and [Wolfson] would offer advice," Tomberlin Deposition 18:14–16, 22–24, would reasonably support such a finding of fact.

 The court finds that, while it appears that the most reasonable inference that can be made from the record is that Wolfson managed and controlled Universal Marion through his designated appointees, a finding by the court on this matter would go beyond that which is permitted on a summary judgment determination, and would require an assessment of credibility of the evidence and the reasonableness of available inferences of the extent of Wolfson's control over Universal Marion by the court. This is not permissible on a motion for summary judgment. *Azrielli, supra,* at 516. Rather, these are determinations that must be made by a jury after a trial on the merits, at which time the jury would have an opportunity to listen to witnesses, examine documentation, and ultimately determine which version of the facts appears more credible.

Accordingly, as the determination as to whether Wolfson can be found to have managed the affairs of Universal Marion to such an extent as to be found liable as an owner or operator under CERCLA can not be made without an assessment of the facts presented, the court finds that genuine issues of material facts remain precluding a finding as to Wolfson's liability, and, as such, neither APU nor Wolfson may be granted summary judgment. Further, a determination as to whether Wolfson would be entitled to assert a successful affirmation defense as a third party or innocent purchaser would also have to be made following an assessment of the facts relating to Wolfson.

#### 4. *Liability of Witben, Universal Marion, and Wolfson as owners and/or operators at the time of disposal*

APU also argues that Witben, Universal Marion, and Wolfson should be held liable as the owners and/or operators of the Union Road Site at a time when hazardous substances were disposed of on the basis that CERCLA liability includes "passive disposal," or disposal of hazardous waste into and through the environment without active human conduct, such as by weather and time. Specifically, APU contends that Witben, Universal, and Wolfson are liable because they operated the facility while hazardous substances were passively disposed there, and that they failed to take any steps to halt this passive disposal. Despite Witben, Universal and Wolfson's contention that all of the hazardous waste at the Union Road Site was deposited prior to Witben's ownership of the Site, APU argues that, over the last decades, hazardous waste materials have been migrating from the pit and containers in which they were initially deposited, and that Witben, Universal, and Wolfson have been aware of this migration and have done nothing to prevent it. In support of its argument, APU points to the fact that the initial response cost estimate to clean the relatively contained tar pit in 1984 was $500,000, while at the present time the response costs are now approximately $11 million.

APU also maintains that Witben, Universal, and Wolfson are liable as they were owners and/or operators of the Union Road Site while hazardous wastes were actively dumped there, based on the fact that unauthorized dumping by third parties was ongoing during Witben's ownership of the site, and that no protective measures were instituted by either Witben, Universal, or Wolfson. Witben, Universal, and Wolfson, however, claim that any dumping of hazardous wastes occurred when New York Central Railroad owned the Site, and that any material dumped without authorization by third parties during their ownership was non-hazardous waste.

### i. Passive Disposal

"Passive" disposal, for purposes of CERCLA, refers to the leaking or migration of hazardous substances into the soil or water following their initial disposal. *Reading Co. v. City of Philadelphia*, 155 B.R. 890, 898 (E.D.Pa.1993). Courts finding that passive disposal is covered under CERCLA define "disposal" to include "not only terms encompassing affirmative human conduct, but also terms indicative of passive conduct: 'leaking' and 'spilling.'" *Howes v. W.R. Peele, Sr. Trust*, 889 F.Supp. 849, 854 (E.D.N.C.1995).

A split of authority exists concerning the issue of liability for passive releases of hazardous substances. Some courts have held that such passive releases constitute a disposal for CERCLA purposes. *See, e.g., Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 844–46 (4th Cir.), *cert. denied*, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); *Peele, supra*, at 854; *Stanley Works v. Snydergeneral Corp.*, 781 F.Supp. 659 (E.D.Cal.1990) ("passive" disposal falls under § 9607(a)). Other courts have rejected the idea that passive releases constitute disposals under CERCLA. *See Redwing Carriers v. Saraland Apartments, Ltd.*, 875 F.Supp. 1545, 1561 (S.D.Ala.1995) (to be a disposal under CERCLA, disposal must result from an affirmative act to introduce hazardous substances into another tract); *United States v. CDMG Realty Co.*, 875 F.Supp. 1077, 1084 (D.N.J.1995) ("disposal" does not encompass a passive element; liability can attach under CERCLA only after some element of active human participation in the disposal can be shown); *United States v. Petersen Sand & Gravel*, 806 F.Supp. 1346, 1351 (N.D.Ill.1992) (passive disposal does not form the basis for CERCLA liability); *Ecodyne Corp. v. Shah*, 718 F.Supp. 1454, 1455–57 (N.D.Cal.1989) (rejecting concept of passive disposal). Neither the Second Circuit, nor any district courts within the circuit, have made any rulings relating to the notion of passive disposal.

█ After a review of the cases relating to passive disposal, the court finds that Congress did not intend so expansive a definition of disposal so as to include the concept of passive disposal. In *Petersen*, the court compared the CERCLA definitions of "disposal" and "release," finding that the term "release" contemplated and encompassed the term "disposal" but not vice versa. *Petersen*, 806 F.Supp. at 1351. The *Petersen* court then found that only those owners/operators during whose watch "disposal" took place suffer CERCLA liability, while a "release" during an owner's tenure does not, of itself, confer liability, stating that it was "[t]he inescapable conclusion ... that giving 'disposal' a passive meaning controverts the plain language of CERCLA." *Petersen, supra*, at 1351–52. *See also In re Diamond Reo Trucks, Inc.*, 115 B.R. 559, 566 (W.D.Mich.1990) (rejecting concept of passive disposal stating that Congress alone must act to change potentially liable parties under CERCLA).

Accordingly, the court finds that Witben, Universal, and Wolfson are not liable under CERCLA upon a theory of passive disposal during Witben's time of ownership.

### ii. Disposal of Hazardous Wastes during Witben's ownership

APU also asserts that Witben, Universal, and Wolfson are liable under CERCLA § 9607(a)(2) as operators of a facility at the time of disposal of hazardous substances based on the active dumping by third parties during this period, and the fact that neither Witben, Universal, nor Wolfson took any steps to prevent such dumping. APU relies on the following facts in support of their argument.

The Remedial Investigation Report prepared for the DEC in June, 1991 described aerial photographs taken of the Union Road Site between 1928 and 1979, and noted that, while no disposal activity is apparent in a 1972 photograph, that in a 1979 photograph, the area north of the tar pit appears to be reworked and used for disposal. Additionally, when the Union Road Site was first investigated in 1982, the property was seen to be littered with household trash and construction debris. In the tar pit, fifty-six drums filled with unidentified substances were observed. In 1986, during another inspection, eighty-one drums were inventoried, including some drums containing "stone with binder," elements used in the mixing of concrete or asphalt. APU asserts that it is clear that drums were being dumped into the tar pit during the 1980's, during Witben's ownership.

Witben, Universal, and Wolfson argue that there is no evidence in the record that any dumping on the property by unauthorized third parties was of hazardous waste. Further, Witben, Universal and Wolfson assert that the inventory of drums in 1982 was based on a visual inspection, while the inventory of drums in 1986 was based on a thorough inspection, and that the larger inventory of drums located in 1986 was only a result of the fact that the inspectors unearthed other drums that were already on the property prior to Witben's ownership. As to the testimony of the New York Central Railroad employee, Edmond Wesolowski, who worked at the Gardenville Yard during the time of dumping, Witben, Universal, and Wolfson contend that his deposition shows that barrels were dumped on the property by the railroad, and that APU's assertion that the railroad reused all of their drums and did not dump any barrels is incorrect.

■ The court finds that there are genuine issues of disputed fact as to this theory of liability relating to the number of drums found at the site, who dumped the drums, whether any dumping of drums took place after Witben took ownership of the property, and whether any dumping of hazardous wastes took place at the Union Road Site after Witben purchased the property. As

such, summary judgment can not be granted as to any party on this issue.

**5. *Sereth Properties, Inc. and Wolsher, Inc.***

In its First Cross–Claim, APU asserted a cause of action under CERCLA against Wolfson, Witben, Universal Marion, Sereth, and Wolsher as owners or operators of the Union Road Site at the time of the disposal of any hazardous substance. In its Second Cross–Claim, APU asserted a cause of action under CERCLA against Wolfson, Witben, Universal Marion, Sereth, and Wolsher as past or current owners or operators of the Union Road Site. However, in its Notice of Motion for Partial Summary Judgment, APU moved for summary judgment against Wolfson, Witben, and Universal Marion only. Further, at oral argument, and in its "Outline of APU Theories of Liability," APU represented that it was advancing no theories of liability against Sereth or Wolsher.

Accordingly, as APU is not opposing Defendant Sereth's and Wolsher's motion for summary judgment, summary judgment will be granted in favor of Sereth and Wolsher against APU on APU's First and Second Cross–Claims.

**6. *Contribution Claims***

In their motion for summary judgment, Defendants Witben, Sereth, Wolsher, Universal Marion, and Wolfson argued for dismissal of APU's CERCLA contribution claim on the ground that APU's predecessor was solely responsible for the contamination of the Union Road Site. Additionally, these Defendants moved for dismissal of APU's state contribution claim on the ground that, as APU had voluntarily agreed to pay for the cleanup, it had no viable claim for contribution, and that APU had failed to demonstrate that its payments for the cleanup were in excess of its proportionate share of liability.

APU has asserted a cost recovery action under § 107 of CERCLA, 42 U.S.C. § 9607(a)(4)(B), for recovery of response costs, and a contribution action under § 113(f) of CERCLA, 42 U.S.C. § 9613(f). Defendants contend that, as APU is a poten-

tial responsible party ("PRP") itself, it cannot bring a cause of action under § 107, but may only bring an action under § 113(f) for contribution.

Section 107(a)(4) provides, in relevant part, that:

any person who accepts or accepted any hazardous substances ... from which there is a release, or a threatened release which causes the incurrence of response costs, ... shall be liable for—
(B) any other necessary costs of response incurred by *any other person* consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4) (emphasis added).

In *Companies for Fair Allocation v. Axil Corp.*, 853 F.Supp. 575 (D.Conn.1994), one of only two district courts within the Second Circuit to consider this issue, the court stated that "the § 107 liability, with its use of the term 'any other person' and its limited defenses to liability, implies that Congress intended the liability provision to sweep broadly." *Cos. for Fair Allocation, supra*, at 579. The court noted that, "while CERCLA is silent as to whether 'any other person' includes other PRPs, a number of courts have found that allowing PRPs to pursue § 107 actions is consistent with the broad scope of liability that Congress intended." *Cos. for Fair Allocation, supra*, at 579 (citing cases all holding that PRPs may pursue cost recovery under § 107). *See also Barton Solvents v. Southwest Petro–Chem, Inc.*, 1993 WL 382047 (D.Kan.1993) court allowed a PRP which had obligated itself through a consent order to incur response costs, without establishing liability, to bring an action against non-settling defendants under both § 107 and § 113, stating that "the weight of authority" establishes that liability under CERCLA is joint and several ... [s]uch liability extends to actions for cost recovery brought by private parties under CERCLA section 107, even actions by private parties who are potentially responsible parties.

In *Town of Wallkill v. Tesa Tape, Inc.*, 891 F.Supp. 955 (S.D.N.Y.1995), the other district court within the Second Circuit to consider the issue held that the town, a PRP under CERCLA was entitled to maintain a claim for both joint and several liability and for contribution against under PRPs. *Town of Wallkill, supra*, at 960. The court noted the holding in *Key Tronic Corp. v. United States,* — U.S. —, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), where the Supreme Court held that:

"[CERCLA] now expressly authorizes a cause of action for contribution in Section 113 and impliedly authorizes a similar and somewhat overlapping remedy in Section 107."

*Key Tronic v. United States*, at —, 114 S.Ct. at 1966.

While stating that the Second Circuit had not yet ruled upon the issue, the court found that CERCLA's broad remedial purposes allowed a PRP to maintain concurrent Section 107 and 113 actions against other PRPs. *Town of Wallkill, supra*, at 960.

Other courts have held that a responsible party may not bring a claim under § 107. *See United States v. Colorado & Eastern Rd. Co.*, 50 F.3d 1530 (10th Cir. 1995); *Ekotek Site PRP Committee v. Self,* 881 F.Supp. 1516 (D.Utah 1995); *United Technologies Corp. v. Browning Ferris Indus.*, 1993 WL 660007 (D.Me.1993), *aff'd,* 33 F.3d 96 (1st Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). These courts have reasoned that allowing a PRP to recover expenditures incurred in cleanup and remediation from other PRPs under § 107's strict liability scheme would render § 113(f) meaningless in that the remedy under each section of the statute would be the same. *Colorado & Eastern Rd. Co., supra*, at 1536. The court finds this reasoning unpersuasive. Whether a PRP seeks relief against another PRP under § 107 or § 113 is of little consequence to the court as it is a question of litigation tactics for the parties. If, when Congress recognized contribution as an available remedy in CERCLA actions, it wished to require a PRP to utilize only § 113 in seeking reimbursement of response costs, it could easily have said so. *See, e.g.,* Section 113(f), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (Oct. 17, 1986).

Given the broad remedial purpose of CERCLA, and construing the statute in this broad fashion, this court will follow the two other decisions within this Circuit that have permitted a PRP which has entered into a consent order to bring an action under both § 107 and § 113 of CERCLA. Accordingly, Defendants' motion for summary judgment on this claim must be DENIED.

A different analysis is required under New York law. New York's contribution statute provides that:

> two or more persons who are subject to liability for damages for the same personal injury, injury to property, or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought.

N.Y.Civ.Prac.L. & R. § 1401 (McKinney 1990).

Prior to the enactment of CERCLA § 113, federal courts seeking to determine whether liable parties had a cause of action for contribution for response costs found that such

> a right to contribution, if it exists in the framework of a particular statutory scheme, must have been created in one of two ways. '[F]irst, through the affirmative creation of a right of action by Congress ... or, second, through the power of federal courts to fashion a common law of contribution.'

*Texas Indust. Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 638, 101 S.Ct. 2061, 2065, 68 L.Ed.2d 500 (1981).

In *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651, 658 (N.D.Ill.), *aff'd on other grounds,* 861 F.2d 155 (7th Cir.1988), and *United States v. Hooker Chemicals and Plastics Corp.,* 739 F.Supp. 125, 129 (W.D.N.Y.1990), it was held that a state law claim for contribution could be brought against any defendants who were not liable for contribution under CERCLA. *See also Hillsborough County v. A & E Road Oiling Service, Inc.,* 853 F.Supp. at 1412 (state contribution claims are only available against parties not liable for contribution under CERCLA); *Warwick Administrative Group v. Avon Products, Inc.,* 820 F.Supp.

116, 124 (S.D.N.Y.1993) (CERCLA does not bar action available under state law for contribution for costs incurred as result of decontamination of hazardous waste site against parties not liable for contribution under CERCLA).

In the instant case, the court has found that Witben and Universal Marion are liable under CERCLA, and that Sereth and Wolsher are not liable under CERCLA. As such, the court finds that the proper causes of action against Witben and Universal Marion are brought under §§ 107 and 113 of CERCLA, and that APU's state claim for contribution should be dismissed as against Witben and Universal Marion. As to Sereth and Wolsher, under New York law, contribution may only be claimed against a joint tortfeasor. N.Y.Civ.Prac.L. & R. § 1401 (McKinney 1990). Given that APU has represented that it has no theory of liability against either Sereth or Wolsher, the court finds that the state claim for contribution should also be dismissed as to Sereth and Wolsher as they are not joint tortfeasors. However, as Wolfson's liability has not yet been determined under CERCLA, APU's state claim for contribution may still be alleged against Wolfson until such time as a determination on his liability under CERCLA is made.

### CONCLUSION

Based on the foregoing, APU's motion for partial summary judgment on its First and Second cross-claims is GRANTED as against Defendants Witben and Universal Marion. APU's motion for partial summary judgment on its First and Second cross-claims are DENIED as against Defendants Wolfson, Sereth, and Wolsher. Defendant Sereth's and Wolsher's motion for summary judgment is GRANTED. Defendant Wolfson's motion for summary judgment is DENIED, except as to the CERCLA claim relating to "passive disposal" which is GRANTED. Defendant Witben's and Universal Marion's motion for summary judgment is also DENIED.

SO ORDERED.